UNITED STATES of America ex rel. Doris MODGLIN and Russ Milko, Plaintiffs,

v.

DJO GLOBAL INC., DJO LLC, DJO Finance LLC, Orthofix, Inc., Biomet, Inc. and EBI, LP, Defendants.

Case No. CV 12–07152 MMM (JCGx).

United States District Court, C.D. California.

Signed Sept. 2, 2014.

David M. Harris, AUSA United States Attorney's Office, Los Angeles, CA, Gerald C. Robinson, Gerald Robinson Law Firm PLLC, David B. Ketroser, MD, David B. Ketroser M.D., J.D., Minneapolis, MN, Linda R. MacLean, Phillip E. Benson, Warren Benson Law Group, Newport Beach, CA, Donald R. Warren, Warren Benson Law Group, La Jolla, CA, for Plaintiffs.

Andrew C. Bernasconi, Reed Smith LLP, Jessica Lynn Ellsworth, Hogan and Hartson LLP, Michele W. Sartori, Hogan Lovells U.S. LLP, Washington, DC, Francisca M. Mok, Reed Smith LLP, Dean Hansell, Hogan Lovells LLP, Los Angeles, CA, Thomas H. Suddath, Reed Smith LLP, Philadelphia, PA, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

MARGARET M. MORROW, District Judge.

*Qui tam* relators Doris Modglin and Russ Milko filed this action against defendants DJO Global Inc. ("DJO Global"), DJO, LLC ("DJO"), DJO Finance LLC ("DJO Finance"), Orthofix, Inc. ("Orthofix"), Biomet, Inc. ("Biomet"), and EBI, LP ("EBI") under seal and *in camera* on August 20, 2012. Relators invoked the court's federal question jurisdiction under 28 U.S.C. § 1331, and alleged a single claim for violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) & (B).[1] On December 26, 2012, they filed a first amended complaint, realleging the federal FCA claim and alleging state FCA claims under the equivalent statutes of 29 states: California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New

---

1. Complaint, Docket No. 1 (Aug. 20, 2012).

York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Virginia, and Wisconsin.[2] On May 17, 2013, the United States declined to intervene in the case.[3] On July 19, 2013, each of the 29 states also declined to intervene.[4] The court unsealed the amended complaint that day.[5]

On October 3, 2013, pursuant to a request by relators, the court dismissed Orthofix.[6] On November 8, 2013, relators filed a second amended complaint, restating their federal and state FCA claims and adding EBI, LLC (also "EBI") as a defendant.[7] On January 22, 2014, the parties filed a stipulation to dismiss DJO Global and DJO Finance as defendants;[8] the court entered an order on the stipulation

2. First Amended Complaint, Docket No. 8 (Dec. 26, 2012).

3. The United States' Election to Decline Intervention, Docket No. 9 (May 17, 2012).

4. States' Election to Decline Intervention, Docket No. 13 (July 19, 2013).

5. Docket (July 19, 2013).

6. Request to Dismiss Defendant Orthofix, Inc., Docket No. 18 (Oct. 2, 2013); Order Dismissing Action Against Defendant Orthofix Without Prejudice, Docket No. 19 (Oct. 3, 2013).

7. Second Amended Complaint, Docket No. 43 (Nov. 8, 2013). Defendants assert, and relators agree, that EBI LLC and EBI, L.P. are the same entity. (See Motion at 1 and Opposition at 9.) The court accordingly refers to both as EBI.

8. Stipulation to Dismiss Defendants DJO Finance and DJO Global, Docket No. 49 (Jan. 22, 2014).

9. Order Dismissing Defendants DJO Global and DJO Finance, Docket No. 50 (Jan. 28, 2014).

10. Order Granting Defendants' Motion to Stay Discovery, Docket No. 57 (Feb. 20, 2014).

on January 28, 2014.[9] On February 20, 2014, the court granted defendants' motion to stay discovery [10] until it decided their pending motion to dismiss the second amended complaint.[11] Relators oppose the dismissal motion.[12] On May 5, 2014, the court held a hearing on the motion. Following the hearing, the court took the motion under submission and directed the parties to file supplemental briefs addressing four questions.[13] The parties did so on July 7, 2014.[14]

## I. FACTUAL BACKGROUND

Relators assert that defendants—manufacturers and distributors of durable medical equipment ("DME")—fraudulently

11. Motion to Dismiss Second Amended Complaint ("Motion"), Docket No. 46 (Jan. 20, 2014).

12. Opposition to Joint Motion to Dismiss Second Amended Complaint, Docket No. 61 (Mar. 19, 2014); Notice of Errata re: Relators' Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Opposition"), Docket No. 62 (Mar. 22, 2014). Relators' opposition is 31 pages. Local Rule 11–6 states that "[n]o memorandum of points and authorities ... shall exceed 25 pages in length, excluding indices and exhibits, unless permitted by order of the judge." CA CD L.R. 11–6. The court did not authorize relators to exceed the page limit, and could strike the opposition for that reason. The court declines to do so in this instance. Relators are cautioned, however, that they must follow all local rules in the future. Should relators submit another memorandum of points and authorities that exceeds the page limits set by the local rules, the court will strike it.

13. Order Directing Parties to File Supplemental Briefing, Docket No. 67 (June 20, 2014).

14. Relators' Responses to the Questions Presented in the Court's June 20, 2014 Order ("Relators' Supp. Brief"), Docket No. 71 (July 7, 2014); Defendants' Joint Supplemental Brief in Support of Motion to Dismiss Second Amended Complaint ("Defendants' Supp. Brief"), Docket No. 72 (July 7, 2014).

caused the government to disburse money by filing claims with Medicare and other federal healthcare plans [15] for reimbursement of their provision of noninvasive, bone-growth stimulators ("stimulators") which they knew had been prescribed by physicians for an off-label purpose, i.e., one not specifically approved by the Food and Drug Administration ("the FDA"). Defendants allegedly failed to reveal to Medicare and other federal healthcare plans that the stimulators were to be used for off-label purposes. Before one can understand the allegations in the complaint, it is necessary to provide an overview of the statutory and regulatory scheme that governs both FDA approval of medical devices and the coverage of such devices by Medicare and other federal programs. The court begins with background on FDA approval of medical devices.

## A. Background Regarding FDA Approval of Medical Devices

■ One of the "core objectives" of the Food, Drug, and Cosmetic Act ("the FDCA"), 21 U.S.C. § 301 *et seq.*, is to ensure that "there is reasonable assurance of the safety and effectiveness of devices intended for human use." *Food and Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133–34, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citing 21 U.S.C. § 393(b)(2)). To that end, the FDCA classifies medical devices in three categories: Classes I, I, and III. 21 U.S.C. § 360c(a). Class III devices include those that present a potential unreasonable risk of illness or injury. *Id.*, § 360c(a)(1)(C). Because of the risk associated with such devices, the FDA has determined that manufacturers of such devices must submit premarket approval ("PMA") applications to the FDA and obtain premarketing clearance before offering the devices for sale.[16] 42 C.F.R. § 405.201(b). Class III devices that do not have PMA approval cannot be marketed and are considered "adulterated." 21 U.S.C. § 351(f)(1)(B) ("A ... device shall be deemed to be adulterated ... if it is a class III device ... which ... is required to have in effect an approved application for premarket approval ... and ... which has an application which has been suspended or is otherwise not in effect"); 42 C.F.R. § 405.201(b).

PMA approval is based on a determination by the FDA that the PMA application contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use. 21 C.F.R. § 814.2(a). It is "a 'rigorous' process in which the manufacturer submits to the FDA extensive study reports, design specifications and descriptions, samples of the device, and proposed labeling, and the FDA conducts a comprehensive review and

---

**15.** These other plans are Medicaid, the Federal Employees Health Benefit Program, the Federal Worker's Compensation Programs, the Civilian Health and Medical Program of the Department of Veterans Affairs ("CHAMPVA"), and Tricare.

**16.** All manufacturers that wish to market Class III devices must obtain a PMA supplement prior to doing so unless the FDA clears a form 510(k) in which the manufacturer has successfully argued that the device should be reclassified as a Class I or II device "because it is substantially equivalent to an existing device so categorized." *United States v. Uni-*

*versal Management Services, Inc.*, 191 F.3d 750, 754 (6th Cir.1999). Manufacturers that wish to market Class I or II devices must also, except in rare circumstances, submit a form 510(k) to the FDA in order to be able lawfully to market the device. (Defendants' Request for Judicial Notice in Support of their Supplemental Brief ("Defendants' Supp. RJN"), Docket No. 73 (July 7, 2014), Exh. 10 at 447 (Medical Devices: Premarket Notification (510k)).) The court takes judicial notice of this, and the other documents cited in this section *infra*.

evaluation of all the submitted documents and materials[.]" *Kashani–Matts v. Medtronic, Inc.*, No. SACV 13–01161–CJC (RNBx), 2013 WL 6147032, *1 (C.D.Cal. Nov. 22, 2013).

If a medical device is used for a purpose other than that for which it has obtained PMA approval, the usage is "off-label." *Carson v. Depuy Spine, Inc.*, 365 Fed. Appx. 812, 815 (9th Cir.2010) (Unpub.Disp.) ("Drugs and medical devices are approved or cleared by the FDA for marketing with labels describing the uses and the patient conditions which have been reviewed in the approval or clearance process. Any use by a physician which differs from the use described in the label or from the patient conditions described in the label is called 'off-label'"). The FDCA explicitly protects physicians' abilities to prescribe devices for such use. 21 U.S.C. § 396 ("Nothing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship"); see also *Houston v. Medtronic, Inc.*, No. 2:13–cv–01679–SVW (SHx), 2014 WL 1364455, *1 n. 1 (C.D.Cal. Apr. 2, 2014) ("Physicians are permitted to use Class III devices in off-label manners"). Indeed, off-label use of medical devices is "generally accepted" within the medical community, and section 396 of the FDCA "expressly disclaims any intent to directly regulate the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 351 & n. 5, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001)

(citing Beck & Azari, FDA, Off–Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 FOOD & DRUG L.J. 71, 72 (1998) ("Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize")); see also *Kashani–Matts*, 2013 WL 6147032 at * 1 n. 4 ("The FDA does not prohibit or regulate off-label use of medical devices by medical professionals, and the Supreme Court has emphasized that off-label use is not merely legitimate but important in the practice of medicine," citing *Buckman*, 531 U.S. at 350, 121 S.Ct. 1012).[17]

The FDCA does, however, expressly prohibit class III device manufacturers from marketing a PMA-approved device for an off-label use. 21 U.S.C. § 331 (proscribing, *inter alia*, "[t]he introduction ... into interstate commerce of any ... device ... that is adulterated or misbranded"); 21 C.F.R. § 814.80 (stating that once the FDA has approved a PMA application, the manufacturer of the approved device may not manufacture, package, store, label, distribute, or advertise the device in a manner that is inconsistent with any conditions of approval specified in the PMA approval order for the device). Because off-label usage of medical devices "is an accepted and necessary corollary of the FDA's mission to regulate in th[e] [medical field] without directly interfering with the practice of medicine," however, *Buckman*, 531 U.S. at 349–50, 121 S.Ct. 1012, "a manufacturer is not liable [for having violated the FDCA] merely because it sells a device

---

17. Relators' Request for Judicial Notice in Support of Opposition to Defendants' Motion to Dismiss Second Amended Complaint ("Relators' RJN"), Docket No. 61 (Mar. 19, 2014), Exh. E at 69–70 (FDA Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices ("Good Reprint Practice") (stating that off-label uses of approved devices "may even constitute a medically recognize[d] standard of care")).

with knowledge that the prescribing doctor intends an off-label use," *Carson*, 365 Fed. Appx. at 815. The manufacturer can only be liable for violating the FDCA if it markets or promotes the device for that purpose.[18] If a device manufacturer wishes to market a device for an off-label purpose, it must submit a PMA supplement for review and approval by the FDA. 21 C.F.R. § 814.39.

### B. Facts Alleged in the Second Amended Complaint Regarding FDA Approval of Defendants' Stimulators

Relators allege that DJO, Biomet, and EBI—a wholly owned subsidiary of Biomet—manufacture and market DME, including stimulators, throughout the United States.[19] They assert that the FDA categorizes stimulators as class III devices, meaning that they must receive PMA approval before they can be marketed.[20] More specifically, they allege that DJO manufactures and markets a stimulator called the SpinaLogic,[21] and that the FDA has approved the SpinaLogic as an adjunct electrical treatment to primary lumbar[22] spinal fusion surgery under PMA Number P910066.[23] Biomet and EBI allegedly man-ufacture and market a stimulator called the SpinalPak.[24] The FDA has approved the SpinalPak as an adjunct electrical treatment to primary lumbar spinal fusion surgery under PMA Number P850022.[25]

### C. Background Regarding Medicare Coverage of Medical Devices

#### 1. Coverage Determinations by Medicare

The Medicare program is a federally funded health insurance program for the aged and disabled created by the Social Security Act ("the Medicare Act"), 42 U.S.C. § 1395 *et seq.* See *International Rehabilitative Sciences Inc. v. Sebelius*, 688 F.3d 994, 997 (9th Cir.2012) ("Medicare is the federal health insurance program for the elderly and disabled"). Part B of the Medicare Act provides medical insurance for medical and other health services obtained by individual plan participants; this includes stimulators and other DME provided to Medicare patients by a DME provider. *Id.* (citing 42 U.S.C. §§ 1395j, 1395k(a)(2), 1395m). Under Part B, "Medicare beneficiaries receive medical treatment and the providers submit claims for government reimbursement." *Id.* (citing § 1395n). Under the Medicare Act,

18. *Id.* (stating that "[a] medical device that is promoted for a use that has not been approved or cleared by FDA is adulterated and misbranded").

19. SAC, ¶¶ 5–6.

20. *Id.*, ¶ 11; Relators' Request for Judicial Notice in Support of Relators' Responses to Court's June 20, 2014 Order ("Relators' Supp. RJN"), Docket No. 70 (July 6, 2014), Exh. A at 13 (FDA Guidance Document for Industry and CDRH Staff for the Preparation of Investigational Device Exemptions and Premarket Approval Applications for Bone Growth Stimulator Devices ("Guidance Document re: Premarket Approval for Stimulators") ("Based upon the potential for serious risk associated with chronic exposure to electrical, electromagnetic, and ultrasound energies at the cellular and molecular levels, the [FDA] regards all bone growth stimulators as significant risk devices")).

21. SAC, ¶ 5.

22. The "lumbar spine" refers to the vertebrae in an individual's lower back. (Merriam–Webster Dictionary, www.merriam-webster.com/dictionary/lumbar (accessed on Apr. 21, 2014) ("relating to or lying near the lower back").)

23. *Id.*, ¶ 5.

24. *Id.*, ¶ 6.

25. *Id.*

only devices that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member" can be reimbursed. 42 U.S.C. § 1395y(a)(1)(A). This limitation on coverage is a method of controlling Medicare costs. *International Rehabilitative Sciences*, 688 F.3d at 997. Under the Act, "[a] device is not 'reasonable and necessary'—and thus is not eligible for Medicare coverage—if it is: [1] ] Not 'safe' and 'effective'—that is, if the device has not 'been proven safe and effective based on authoritative evidence' or is not 'generally accepted in the medical community as safe and effective for the condition for which it is used'; [2] ] '[E]xperimental'—that is, 'investigational'; [3] ] Not '[a]ppropriate' for the individual beneficiary's needs; or [4] ] '[S]ubstantially more costly than a medically appropriate and realistically feasible alternative pattern of care.' " *Id.* (citing § 1395y(a)(1)(A) and 54 Fed.Reg. 4302, 4303–04 (Jan. 30, 1989); 60 Fed.Reg. 48417, 48418 (Sept. 19, 1995)).

*Cf.* Medicare Program Integrity Manual § 13.7.1. (stating that "[i]n order of preference, [local coverage determinations] should be based on: [1] Published authoritative evidence derived from definitive randomized clinical trials or other definitive studies, and [2] General acceptance by the medical community (standard of practice), as supported by sound medical evidence").[26] "[The Centers for Medicare and Medicaid Services ('CMS') ] uses the FDA categorization of a device as a factor in making Medicare coverage decisions." 42 C.F.R. § 405.201(a)(1). Thus, under this scheme, "FDA clearance [ ] is necessary, but not sufficient, for Medicare coverage.... To be 'reasonable and necessary' for treatment, a device must be 'safe and effective,' but other considerations are also relevant—like whether there are less costly but equally effective devices available." *International Rehabilitative Sciences*, 688 F.3d at 1002 (emphasis omitted).

In its Medicare National Coverage Determinations Manual ("the Medicare Manual"), the Department of Health and Human Services ("HHS") has considered the FDA categorization of devices and determined generally that "[d]evices that may be covered under Medicare include the following categories: [1] Devices approved by the FDA through the Pre–Market Approval (PMA) process; [2] Devices cleared by the FDA through the 510(k) process; [3] FDA-approved IDE Category B devices; and [4] Hospital Institutional Review Board (IRB) approved IDE devices." [27]

Within these general categories of devices eligible for coverage, HHS "may make [Medicare] coverage determinations [for certain types of devices] via up-front rules." The agency, however, has "discretion ... whether to make [broad] determinations [as to whether a particular device is reimbursable] ... or [whether to have Medicare contractors make that decision based on a] case-by-case adjudication." *Id.* at 1001. When HHS engages in rulemaking regarding the scope of coverage for certain devices, it issues National Coverage Decisions ("NCDs"). "An NCD is a determination ... of whether a particular item or service is covered nationally under

---

**26.** The court takes judicial notice of the contents of the Medicare Program Integrity Manual. See http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/pim83c13.pdf (accessed on July 30, 2014).

**27.** Relators' RJN, Exh. J at 136–137 (Medicare Manual Chapter 14—Medical Devices). The court takes judicial notice of this document *infra*.

Medicare." 42 C.F.R. § 405.1060(a)(1). NCDs are compiled in the Medicare Manual. "Once published . . ., an NCD is binding on all Medicare carriers."[28] *Almy v. Sebelius,* 679 F.3d 297, 299 (4th Cir.2012) ("[T]he Secretary [of HHS] can make a 'national coverage determination' (NCD) binding throughout the Medicare system and not subject to review by administrative law judges"); see also 42 C.F.R. § 405.1060(a)(4) ("An NCD is binding on fiscal intermediaries, carriers, . . . [administrative law judges], and the [Medicare Appeals Council]," among others). Additionally, individual carriers—the private insurance carriers with whom HHS contracts to administer claims—can issue Local Coverage Determinations ("LCDs"). LCDs address local coverage issues. *Almy,* 679 F.3d at 299–300. If no NCD or LCD addresses a particular device, contractors determine coverage on a case-by-case basis. *Id.* at 300 ("Finally, if no NCD

or LCD is in place, 'contractors may make individual claim determinations,' including whether a particular DME meets the statutory requirement of being 'reasonable and necessary'" (citing 68 Fed.Reg. 63,-693)).

The reimbursement of stimulators is covered by NCD 150.2.[29] NCD 150.2 states that stimulators are covered by Medicare for six uses, one of which is "as an adjunct to spinal fusion surgery" for certain patients.[30] There are also four LCDs that address the coverage of stimulators. Each mirrors the criteria set forth in NCD 150.2, in that it provides that stimulators are covered, *inter alia,* "as an adjunct to spinal fusion surgery."[31] Neither NCD 150.2 nor the four LCDs covering stimulators distinguish between stimulators used on one part of the spine, e.g., the cervical spine, versus another, e.g., the lumbar spine. Nor do they distinguish

28. Relators' RJN, Exh. H at 94 (Medicare Program Integrity Manual, Chapter 13—Local Coverage Determinations, § 13.1.1). The court takes judicial notice of this document *infra.*

29. Defendants' Request for Judicial Notice in Support of Joint Motion to Dismiss Second Amended Complaint ("Defendants' RJN"), Exh. 1 (National Coverage Determination for Osteogenic Stimulators (150.2) ("NCD 150.2")). The court takes judicial notice of this document, *infra.*

30. *Id.* at 7.

31. *Id.,* Exhs. 3 at 15 (Local Coverage Determination (LCD): Osteogenesis Stimulators (LCD L11501), covering Connecticut, D.C., Delaware, Massachusetts, Maryland, Maine, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and Vermont ("LCD L11501") ("A spinal electrical osteogenesis stimulator (E0748) is covered only if any of the following criteria are met . . . Following spinal fusion surgery")); Exh. 4 at 33 (Local Coverage Determination (LCD): Osteogenesis Stimulators (LCD L11490), covering Alaska, American Samoa, Arizona, California, Guam, Hawaii, Iowa, Idaho, Kansas, Mis-

souri, Montana, North Dakota, Nebraska, Nevada, Oregon, South Dakota, Utah, Washington, Wyoming, Northern Mariana Islands ("LCD L11490") ("A spinal electrical osteogenesis stimulator (E0748) is covered only if any of the following criteria are met . . . Following spinal fusion surgery")); Exh. 5 at 52 (Local Coverage Determination (LCD): Osteogenesis Stimulators (LCD L5012), covering Alabama, Arkansas, Colorado, Florida, Georgia, Louisiana, Mississippi, North Carolina, New Mexico, Oklahoma, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Virgin Islands, West Virginia ("LCD L5012") ("A spinal electrical osteogenesis stimulator (E0748) is covered only if any of the following criteria are met . . . Following spinal fusion surgery")); Exh. 6 at 67 (Local Coverage Determination (LCD): Osteogenesis Stimulators (LCD L27026), covering Illinois, Indiana, Kentucky, Michigan, Minnesota, Ohio, and Wisconsin ("LCD L27026") ("A spinal electrical osteogenesis stimulator (E0748) is covered only if any of the following criteria are met . . . Following spinal fusion surgery")). The court takes judicial notice of these documents *infra.*

between stimulators based on on-label versus off-label use.[32]

NCD 280.1, the "Durable Medical Equipment Reference List" is a "quick reference tool" that applies "(where appropriate) to all DME national coverage determinations (NCDs)."[33] It provides a list of

"generic categories of equipment on which NCDs have been made by ... CMS.... In the case of equipment categories that have been determined by CMS to be covered under the DME benefit, the list outlines the conditions of coverage that must be met if payment is to be allowed for the rental or purchase of the DME by a particular patient, or cross-refers to another section of the manual where the applicable coverage criteria are described in more detail. With respect to equipment categories that cannot be covered as DME, the list includes a brief explanation of why the equipment is not covered.... When the contractor receives a claim for an item of equipment which does not appear to fall logically into any of the generic categories listed, the contractor has the authority and responsibility for deciding whether those items are covered under the DME benefit. These decisions must be made by each contractor based on the advice of its medical consultants, taking into account: [1] The Medicare Claims Processing Manual, Chapter 20, 'Durable Medical Equipment, Prosthetics and Orthotics, and Supplies' (DME-POS)[;] [2] Whether the item has been approved for marketing by the Food and

Drug Administration (FDA) and is otherwise generally considered to be safe and effective for the purpose intended; and [3] Whether the item is reasonable and necessary for the individual patient."[34]

NCD 280.1 thus serves as a first point of reference for contractors attempting to determine whether a certain device or a certain use of a device is covered. Specifically, it provides an index of some of the national coverage determinations Medicare has made. It lists some devices that are covered and refers the reader to the NCD controlling that device. It also lists some devices that are not covered and articulates why HHS has determined that that device cannot be covered. For devices that HHS has not explicitly declared covered or uncovered, NCD 280.1 sets forth the factors a contractor must consider in making a case-by-case coverage determination. NCD 280.1 is not comprehensive, however. Certain devices that are covered by a particular NCD are not referenced in NCD 280.1. This is because NCD 280.1 was meant only to aid in determining coverage for "certain pieces of DME and especially for those items commonly referred to by both brand and generic names."[35] As the NCDs are binding on Medicare contractors, the contractors must follow an NCD dictating coverage for a certain device, even if that device is not listed in NCD 280.1.

### 2. The Reimbursement Process

To submit a claim for reimbursement, DME providers fill out and submit to

---

**32.** See Defendants' RJN, Exhs. 1 (NCD 150.2); 3 (LCD L11501), 4 (LCD L11490), 5 (LCD L5012), and 6 (LCD L27026). The "cervical spine" refers to the vertebrae in an individual's neck. (Merriam–Webster Dictionary, www.merriam-webster.com/dictionary/cervical (accessed on Apr. 21, 2014) ("of or relating to the neck").)

**33.** Relators' RJN, Exh. F (Medicare Manual, Chapter. 1, Part 4, Coverage Determinations, § 280.1—Durable Medical Equipment Reference List ("NCD 280.1")). The court takes judicial notice of this document *infra*.

**34.** *Id.*

**35.** *Id.*

Medicare CMS Form 1500.[36] Section 23 of the form includes a space for the provider to list any PMA approval number covering the device for which it seeks reimbursement.[37] Providers seeking reimbursement for stimulators must also include a "KF" modifier on CMS Form 1500, which indicates that the provider is billing Medicare for a Class III device.[38]

Together with CMS Form 1500, the provider must submit a Certificate of Medical Necessity.[39] The Certificate of Medical Necessity used for class III stimulators is CMS 847.[40] CMS 847 has four sections. Section A seeks general information concerning the patient, physician, and supplier.[41] Section B requests information regarding the medical necessity for the device, and states: "Information in this Section May Not Be Completed by the Supplier of the Items/Supplies." Section C provides space for a "Narrative Description of Equipment and Cost."[42] Section C of CMS 847 instructs the person completing the form to provide a "(1) Narrative description of all items, accessories and options ordered; (2) [the] Supplier's charge; and (3) [the] Medicare Fee Schedule Allowance for each item, accessory,

and option."[43] Section D is the physician's attestation and signature.[44]

The DME provider must also include the Healthcare Common Procedure Coding System ("HCPCS") number for the device for which it is requesting reimbursement on both CMS Form 1500 and CMS 847.[45] There is a generic HCPCS code number for all stimulators: E0748.[46]

By regulation, DME providers seeking reimbursement must furnish sufficient information to Medicare's claim processing contractors that they can determine whether payment is due. 42 C.F.R. § 424.5(a)(6) ("As a basis for Medicare payment, the following conditions must be met: ... The provider, supplier, or beneficiary, as appropriate, must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment").

### D. Facts Alleged in the Second Amended Complaint Regarding Defendants' Submission of Claims to the Medicare Program

Relators allege that defendants are approved Medicare DME providers.[47] To

**36.** Relators' RJN, Exh. R (Health Insurance Claims Form 1500 ("CMS Form 1500")). The court takes judicial notice of this document *infra*.

**37.** *Id.*

**38.** CMS Manual System, Pub. 100–04 Medicare Claims Processing, Transmittal 236, at 3, http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R236CP.pdf (accessed on April 24, 2014) ("Modifier KF is a pricing modifier. The description for modifier KF is as follows: Item designated by FDA as class III device"). The court takes judicial notice of this fact based on an official document available on the CMS website.

**39.** Defendants' RJN, Exh. 2 at 11 (Certificate of Medical Necessity CMS–847–Osteogenesis

Stimulators ("CMS 847")). The court takes judicial notice of this document *infra*.

**40.** *Id.*

**41.** *Id.*

**42.** *Id.*

**43.** *Id.*

**44.** *Id.*

**45.** Relators' RJN, Exh. R (CMS Form 1500); Defendants' RJN, Exh. 2 (CMS 847).

**46.** Defendants' RJN, Exhs. 3 (LCD L11501), 4 (LCD L11490), 5 (LCD L5012), and 6 (LCD L27026).

retain that status, defendants purportedly must certify every three years that they meet and will continue to meet all applicable federal and state licensure and regulatory requirements.[48]

Relators allege that when a physician prescribes a stimulator manufactured by one of the defendants, a local distributor under contract to the defendant collects relevant medical records and prescriptions and forwards them to an insurance administrator at the defendant's home offices.[49] The insurance administrator and claims processor then prepare and submit claims to Medicare and other insurance carriers.[50] Relators assert that since approximately September 18, 2001, defendants have routinely submitted false or fraudulent claims for stimulators to Medicare. Specifically, they allege that defendants have requested reimbursement for stimulators approved for lumbar spinal use only when they knew, and did not reveal, that the stimulators had been distributed for off-label cervical spinal use.[51] Relators contend that stimulators are nonreimbursable if they are not distributed for the use for which they have PMA approval.[52] They allege that, by indicating on CMS Form 1500 a PMA approval number for a stimulator approved only for lumbar, and not for cervical, spinal use, defendants expressly or implicitly misrepresent the device's intended use. Stated differently, they contend that by reporting their stimulator's PMA approval number on CMS Form 1500, defendants affirmatively represent that the stimulator will be used on the lumbar spine when they know it will be used on the cervical spine instead.[53] Relators assert that, because there is only one HCPCS code covering stimulators used on all parts of the spine, and because defendants' stimulators are only approved for use on the lumbar spine, unless defendants specifically indicate in the narrative description portion of CMS 847 that the device has been distributed for an off-label use, they violate the requirement that they furnish sufficient information for Medicare's claim processing contractors to determine whether payment is due. Relators also contend that by not indicating in the narrative description portion of CMS 847 that the stimulator is being distributed for an off-label use, defendants expressly and/or impliedly misrepresent that the stimulator is being distributed and used as indicated in the PMA approval and that it is therefore reimbursable.[54]

As proof that defendants have submitted such claims for reimbursement, relators plead facts concerning their interactions with defendants over the years. They allege that in 1997, relator Milko was hired as a direct sales representative for Orthofix to promote and sell stimulators.[55] Orthofix is a major manufacturer and distributor of stimulators and defendants' primary competitor.[56] Orthofix manufactures and distributes the only stimulator with PMA approval for cervical use: the Cervical–Stim.[57] Orthofix developed the

47. SAC, ¶¶ 5–6.

48. *Id.*

49. *Id.*, ¶ 30.

50. *Id.*

51. *Id.*

52. *Id.*

53. *Id.*, ¶ 29.

54. *Id.*, ¶ 28.

55. *Id.*, ¶ 35.

56. *Id.*, ¶¶ 13, 15.

57. *Id.*, ¶¶ 14, 16.

Cervical–Stim after the FDA issued a public warning in 1997 that Orthofix had been unlawfully marketing its Physio–Stim stimulator for cervical use because it did not have PMA approval for the use of the device in that manner; Orthofix's PMA approval for the Physio–Stim covered only use for "the treatment of nonunion of long bone fractures acquired secondary to trauma and for the treatment of flat bones, excluding vertebra." [58] The warning letter concluded that use of the Physio–Stim for treatment of cervical spine fusion was "a change in indication that require[d] a PMA supplement" if Orthofix intended to continue marketing the device for that purpose.[59]

Relators allege that on July 1, 2005, Milko became an Orthofix distributor and that he has continued in that capacity since then, marketing and selling the Cervical–Stim and Orthofix's other, non-cervical stimulators.[60] They assert that because of his position with Orthofix, Milko learned that defendants were distributing their stimulators for off-label, cervical use.[61] Specifically, they allege that Milko heard that DJO sales personnel verbally instructed patients to use the SpinaLogic by folding it up, placing a pillow over it, and lying their head on the pillow for 30 minutes and that they reassured doubtful patients that the device worked better on the cervical spine than on the lumbar spine although

not approved for that use because the cervical spine was a smaller area to heal.[62]

In April 2011, a sales associate working for Milko left his employ and went to work for DJO; the associate sold the SpinaLogic in the same geographic area in which Milko sold Orthofix products. Milko lost "some of his best physician referral sources, including physicians who regularly referred Medicare patients for cervical bone growth stimulators, even though [as noted,] Orthofix sold the only approved cervical device." [63] As a result, Milko concluded that DJO must have filled cervical stimulator prescriptions for his former physician clients with the SpinaLogic and charged Medicare and other federally sponsored health care programs for it.[64]

Relators assert that Milko sued his former associate for violating a non-competition agreement.[65] During the lawsuit, Milko deposed two referring physicians, both of whom are Medicare providers who perform lumbar and cervical spine fusion surgeries. Both doctors testified that they had ordered stimulators from Milko's former associate.[66]

Relators allege that on June 21, August 30, and September 1, 2011, the Spine and Brain Institute in Las Vegas, Nevada, faxed prescriptions on behalf of Dr. John Anson, the ordering physician, to the local DJO sales representative for SpinaLogic;

58. *Id.*, ¶¶ 13, 15.

59. Defendants' RJN, Exh. 7 at 81 (July 3, 1997 Letter Warning Letter from the FDA to Orthofix); *id.*, ¶ 15.

60. *Id.*, ¶ 36.

61. *Id.*

62. *Id.*

63. *Id.*, ¶ 37.

64. *Id.*

65. *Id.*

66. *Id.*, ¶ 38. Relators allege these physicians testified that they did not complete CMS 847 forms in connection with these orders. (*Id.*) They do not plead, however, that defendants forged the physicians' signatures on the form, that defendants wrongfully completed Section B, or that when a manufacturer completes the form instead of the physician, this alone means the manufacturer has made a false

the institute indicated that the patients were Medicare beneficiaries and were diabetic.[67] On February 2, 2012, DJO submitted a claim to the Minnesota Health Care Programs for a stimulator to be used following cervical fusion surgery. The Minnesota program paid DJO $835.82.[68]

In August 2012, DJO's Regional Sales Director and a DJO sales representative told relator Modglin, a private investigator licensed by the state of California, that DJO routinely billed federally sponsored health care programs like Medicare and Medicaid for off-label distribution of Spina-Logic for use on the cervical spine.[69] In March 2013, Milko attended the national convention of the American Academy of Orthopedic Surgeons in Chicago. There, he spoke with DJO representatives, who told him that in some areas of the country, at least 75 % of DJO's business came from selling the SpinaLogic for cervical use.[70] Relators assert that at some point, two patients told Milko when he fitted them with lumbar stimulators that they had previously been fitted with the SpinaLogic following prior, cervical spinal surgeries.[71]

In May 2013, Orthofix's sales representative in Temecula, California, switched companies and began to sell the SpinaLogic. After two weeks, the representative returned to Orthofix. Relators contend that while working for DJO, DJO upper management told the sales representative that 40% of the company's SpinaLogic business involved off-label, cervical spine applications.[72]

As respects the SpinalPak manufactured by Biomet and EBI, relators allege that Milko has provided replacement Cervical–Stims to Medicare patients who complained that their use of the SpinalPak on the cervical spine caused skin irritation on their necks.[73] Relators assert that Milko confirmed these complaints by observing large, red skin irritations on the patients.[74] The patients purportedly said that Biomet and EBI representatives told them to use the SpinalPak only for a couple of hours per day, as tolerated.[75]

On February 16 and March 10, 2010, and on March 18, 2011, Biomet and EBI submitted claims to the Minnesota Health Care Programs for off-label stimulators under Code E0748, for use following cervical spinal fusion surgery. They were paid $817.05, $3,901.41, and $3,897.50 on the claims, respectively.[76]

Relators allege that on September 5, 2012, Dr. David Ketroser, a neurologist, contacted the office of a neurosurgeon in Minnesota. An employee confirmed that the office routinely prescribed the SpinalPak for cervical and lumbar fusions, for both Medicare and non-Medicare patients, and that it had done so for a particular patient Ketroser had referred.[77]

On May 20, 2013, Milko asked a former Biomet distributor who now sells Orthofix devices how Biomet succeeded in securing Medicare payment for a lumbar-only device when the physician's order indicated cervical application. The individual pur-

claim to the government by submitting the form.

67. *Id.,* ¶ 45.

68. *Id.*

69. *Id.,* ¶ 3.

70. *Id.,* ¶ 39.

71. *Id.,* ¶ 40.

72. *Id.,* ¶ 44.

73. *Id.,* ¶ 47.

74. *Id.*

75. *Id.*

76. *Id.,* ¶ 48.

77. *Id.,* ¶ 49.

portedly told him that neither the CMS 847 Form nor the E0748 billing code reveal the level of the spine for which the device was ordered.[78] On May 29, 2013, a former Biomet sales representative told Modglin that she had sold Biomet's devices off-label to Medicare patients for use on the cervical spine.[79] On May 31, 2013, a former Biomet sales representative told Modglin that he had sold the SpinalPak to Medicare and Medicaid patients in Texas between 2009 and 2011 for use on the cervical spine.[80]

### E. The Parties' Requests for Judicial Notice

■ The parties request, in both their original and supplemental briefs, that the court take judicial notice of certain documents they contend are relevant to this motion.[81] All of the applications are unopposed. In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1989). A court normally must convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment if it "considers evidence outside the pleadings.... A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion...." *United States v. Ritchie*, 342

F.3d 903, 907–08 (9th Cir.2003). See *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *Branch v. Tunnell* 14 F.3d 449, 453 (9th Cir.1994) (noting that a court may consider a document whose contents are alleged in a complaint, so long as no party disputes its authenticity), overruled on other grounds in *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002). Under Rule 201, the court may judicially notice a fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R.EVID. 201(b).

### 1. Relators' Request for Judicial Notice

Relators request that the court judicially notice thirty-two documents. The documents fall into several general categories:

(1) Documents available on the FDA's website: Comments by the BGS Reclassification Opposition Group in opposition to a petition for reclassification of bone-growth stimulators from Class III to Class II;[82] FDA guidance on the PMA requirement;[83] FDA guidance on PMA

---

78. *Id.*, ¶ 48.

79. *Id.*, ¶ 50.

80. *Id.*, ¶ 51.

81. Relators' RJN; Defendants' RJN; Relators' Supp. RJN; Defendants' Supp. RJN.

82. Relators' RJN, Exh. A (Comments by the BGS Reclassification Opposition Group in opposition to a petition for reclassification of bone-growth stimulators from Class III to Class II ("BGS Reclassification Opposition Group Comments")).

83. *Id.*, Exh. D (FDA guidance on the PMA requirement).

Supplements and Amendments;[84] FDA guidance on "Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices;"[85] Implementation of the FDA/HCFA Interagency Agreement Regarding Reimbursement Categorization of Investigational Devices;[86] "Guidance Document for Industry and CDRH Staff for the Preparation of Investigational Device Exemptions and Premarket Approval Applications for Bone Growth Stimulator Devices";[87] "Guidance for Industry and FDA Staff: Modifications to Devices Subject to Premarket Approval (PMA)—The PMA Supplement Decision–Making Process";[88] FDA Docket re: petition that "Non–Invasive Bone Growth Stimulator[s] be reclassified from Class III to Class II";[89] FDA decision denying "Orthopedic Devices: Reclassification of Non–Invasive Bone Growth Stimulator";[90] PMA Supplements filed by DJO Global;[91] FDA Approval Materials for SpinaLogic;[92] PMA Supplements filed by EBI/Biomet;[93] FDA Approval Materials for SpinalPak;[94] FDA Approval Materials for Cervical–Stim;[95] (2) Documents available on the CMS Website: Medicare National Coverage Determinations Manual, Forward;[96] Medicare National Coverage Determinations Manual, NCD 280.1;[97] Medicare Program Integrity Manual, Chapter 13—Local Coverage Determinations;[98] Medicare Benefit Policy Manual, Chapter 14—Medical Devices;[99] Durable Medical Equipment, Prosthetics, Orthotics, and Supplies Quality Standards;[100]

84. *Id.*, Exh. B (FDA guidance on PMA Supplements and Amendments).

85. *Id.*, Exh. E (Good Reprint Practice).

86. *Id.*, Exh. K (Implementation of the FDA/HCFA Interagency Agreement Regarding Reimbursement Categorization of Investigational Devices).

87. Relators' Supp. RJN, Exh. A (Guidance Document re: Premarket Approval for Stimluators).

88. Relators' Supp. RJN, Exh. B (FDA Modifications to Devices Subject to Premarket Approval (PMA)—the PMA Supplement Decision–Making Process ("When to File a PMA Supplement")).

89. Relators' Supp. RJN, Exh. C (FDA Docket for Petition: Non-invasive Bone Growth Stimulator be Reclassified from Class III to Class II in Accordance with Section 513(e) of the Food and Drug Cosmetic Act (FDCA), 21 C.F.R. § 860.123 and 21 C.F.R. § 860.130).

90. Relators' Supp. RJN, Exh. D (FDA Decision Denying Petition: Orthopedic Devices: Reclassification of Non–Invasive Bone Growth Stimulator).

91. Relators' Supp. RJN, Exh. F (PMA Supplements Filed by DJO Global).

92. Relators' Supp. RJN, Exh. G (FDA Approval Materials for SpinaLogic).

93. Relators' Supp. RJN, Exh. I (PMA Supplements Filed by EBI/Biomet).

94. Relators' Supp. RJN, Exh. J (FDA Approval Materials for SpinalPak).

95. Relators' Supp. RJN, Exh. L (FDA Approval Materials for Cervical–Stim).

96. Relators' RJN, Exh. G (Medicare National Coverage Determinations Manual, Forward).

97. *Id.*, Exh. F (NCD 280.1).

98. *Id.*, Exh. H (Medicare Program Integrity Manual, Chapter 13—Local Coverage Determinations).

99. *Id.*, Exh. J (Medicare Benefit Policy Manual, Chapter 14—Medical Devices).

100. *Id.*, Exh. N (Durable Medical Equipment, Prosthetics, Orthotics, and Supplies Quality Standards).

Medicare Enrollment Application—Durable Medical Equipment, Prosthetics, Orthotics, and Supplies Supplier;[101] CMS Form 1500;[102]

(3) A document available on the Medi-Cal website: Medi-Cal Provider Agreement;[103]

(4) Defendants' SEC filings: DJO Finance's Form 10–K for the fiscal year ending December 31, 2013,[104] Biomet's Form 10–K for fiscal year ending May 31, 2013;[105]

(5) Court filings in other cases: Complaint in *United States ex rel. Allen v. Guidant LLC, et al.;*[106] Order in *United States ex. rel. Bui v. Vascular Solutions, Inc.;*[107] Brief for the United States as Amicus Curiae in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., et al.;*[108] State of Texas' Statement of Interest in *United States ex. rel. Bergman v. Abbott Laboratories;*[109]

(6) Various insurance policies excluding from coverage stimulators used on the cervical spine: Federal Employee Program Policy Statement, Lifewise Healthplan of Oregon Policy Statement, Premara Blue Cross Policy Statement;[110] and

(7) Documents available on defendants' and Orthofix's websites: "CMF Spina-Logic" on DJO Global's website;[111] "Patient FAQ Brochure," on Biomet's website;[112] Image of Cervical–Stim on Orthofix's website. 113

 Under Rule 201, the court can take judicial notice of "[p]ublic records and government documents available from reliable sources on the Internet," such as websites run by governmental agencies. See *Hansen Beverage Co. v. Innovation Ventures, LLC,* No. 08–CV–1166–IEG, 2009 WL 6597891, *1 (S.D.Cal. Dec. 23, 2009) (citing *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999)). See also *Daniels–Hall v. National Education Association,* 629 F.3d 992, 999 (9th Cir.2010) (taking judicial notice of information on the websites of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson,* No. C 06–4670, 2008 WL 4183981, *5 (N.D.Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice"). The court could, therefore, take

---

101. *Id.,* Exh. O (Medicare Enrollment Application—Durable Medical Equipment, Prosthetics, Orthotics, and Supplies Suppliers).

102. *Id.,* Exh. R (CMS Form 1500).

103. *Id.,* Exh. S (Medi–Cal Provider Agreement).

104. *Id.,* Exh. L (Form 10–K for DJO Finance for the fiscal year ending December 31, 2013).

105. *Id.,* Exh. M (Form 10–K, LAB Acquisition for Biomet for the fiscal year ending May 31, 2013).

106. *Id.,* Exh. C (Complaint in *United States ex rel. Allen v. Guidant LLC, et al.*).

107. *Id.,* Exh. P (Order in *United States ex Rel. Bui v. Vascular Solutions, Inc.*).

108. *Id.,* Exh. Q (Brief for the United States as Amicus Curiae in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., et al.*).

109. *Id.,* Exh. T (State of Texas' Statement of Interest in *United States, ex. rel. Bergman v. Abbott Laboratories* ).

110. *Id.,* Exh. I (Federal Employee Program Policy Statement, Lifewise Healthplan of Oregon Policy Statement, Premara Blue Cross Policy Statement).

111. Relators' Supp. RJN, Exh. E (CMF Spina-Logic).

112. Relators' Supp. RJN, Exh. H (SpinalPak Patient FAQ Brochure). 113 Relators' Supp. RJN, Exh. K (Cervical–Stim®).

judicial notice of the documents relators proffer from the websites of the FDA, CMS, Medi–Cal, and the SEC. The court will take judicial notice of most of these documents.[114] Because the court declines to exercise supplemental jurisdiction over relators' state law claims *infra*, it need not consider the Medi–Cal Provider Agreement relators ask the court to notice from the Medi–Cal website. To the extent relators request that the court do so, the court denies their request for judicial notice.

■ As respects court orders and filings in other FCA cases, these documents, too, are the proper subject of judicial notice. See *Reyn's Pasta Bella, LLC v. Visa USA, Inc.* 442 F.3d 741, 746 n. 6 (9th Cir.2006) (taking judicial notice of pleadings, memoranda, and other court filings); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 290 n. 1 (9th Cir.1996) (court may take judicial notice of pleadings and court orders in related proceedings); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir.1992) (a court may take judicial notice "of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"). The court, however, declines to do so as it concludes that the documents are not rele-

vant. The position the government took in the complaint in *United States ex rel. Allen v. Guidant Corp.* and the court's analysis in the order issued in *United States ex rel. Bui v. Vascular Solutions* are not relevant to decision of the motion because both involved the marketing of a device for off-label use, something relators do not allege here. The government's position regarding the requirements of Rule 9(b) in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc., et al.* is not binding on the court and thus is not relevant in deciding the motion. Finally, because the court declines to exercise supplemental jurisdiction over relators' state law claims, it need not consider the State of Texas' Statement of Interest in *United States, ex rel. Bergman v. Abbott Laboratories.*

■ The court also declines to take judicial notice of the sixth category of documents relators identify because there is no basis upon which to take judicial notice of these documents. Policy statements by private insurance companies are not information generally known within the geographic territory of the court. Nor are they capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Al-

114. While taking judicial notice of documents on the SEC website is appropriate, the documents themselves are of limited relevance. As relators note, both SEC documents contain acknowledgments by defendants that they submit claims to Medicare, which of course relators must prove in order to prevail on their federal FCA claim. (See Opposition at 28.) As respects claims submitted to Medicare, relators have adequately pled that defendants submitted such claims and thus the documents add little to the pleading. Relators must also plead and prove, however, that some of the claims were false. Defendants' acknowledgment that they submit claims to Medicare does not advance relators' argument that any of the claims submitted were

false. Relators also cite acknowledgments in these documents that defendants' devices are subject to the FDCA and that defendants therefore must file PMA Supplements for any new use of an already-approved device prior to marketing or labeling it for such use. (Opposition at 22–23.) This acknowledgment does not advance relators' argument because, as the court determines *infra*, Medicare covered defendants' devices regardless of the use for which they were intended. Relators, moreover, have not argued that defendants unlawfully marketed or labeled their stimulators for an unapproved use. For these reasons, while the court judicially notices the defendants' 10–K forms, it finds them of limited relevance to its decision.

though relators argue that they offer the documents "for the limited purpose of demonstrating that not all insurance carriers will cover use of an osteogenic stimulator when the device is to be used for the cervical area of the spine," they do not identify a basis upon which the documents can be judicially noticed.[115] The fact that relators seek to have the court notice the documents for "a limited purpose" only does not make them a proper subject of judicial notice. Even if the court could take judicial notice of the insurance documents, moreover, it would conclude that they are irrelevant for purposes of deciding this motion. Whether other healthcare insurance plans cover a particular treatment is not probative as to whether Medicare likewise covers it. Accordingly, the court denies relators' request that it take judicial notice of these documents.

■■■■ Finally, the court declines to take judicial notice of the seventh category of documents: documents available on defendants' and Orthofix's websites. Relators contend that courts can take judicial notice of "commercial website posts and product labeling."[116] In one of the cases they cite, the court did consider product labels under the incorporation by reference doctrine.[117] See *McMahon v. Take–Two Interactive Software, Inc.*, No. EDCV 13–02032–VAP (SPx), 2014 WL 324008, *2 (C.D.Cal. Jan. 29, 2014) ("When a complaint alleges UCL and FAL claims, a court may take judicial notice of and consider 'advertising,' including product labeling and promotional announcements, [under the incorporation by reference doctrine] even where those materials are not attached to a complaint, because those documents are central to the UCL and FAL claims"). The other

decision in which a court judicially noticed product labeling does not articulate why the court did so, and it is therefore unpersuasive. See *Stephenson v. Neutrogena Corporation*, No. C 12–0426 PJH, 2012 WL 8527784, *2 (N.D.Cal. July 27, 2012) ("Defendant also requests that the court take judicial notice of the product labeling and/or packaging for the Neutrogena Naturals products at issue.... As to the purifying cleanser, the court grants defendant's request to take judicial notice of the product's label"). The incorporation by reference doctrine "permits a district court to consider documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleadings.'" *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 986 (9th Cir.1999) (citing *Branch*, 14 F.3d at 454). Relators rely on documents from defendants' websites and Orthofix's website to show that the design of each of the three stimulators is different. The contents of the documents are not alleged in relators' second amended complaint, however, and relators' claims do not rely on them. It would thus be inappropriate to consider them under the incorporation by reference doctrine. Moreover, although the court could perhaps take judicial notice of the designs of the three stimulators on the basis that the designs are capable of ready and accurate determination from sources whose accuracy cannot reasonably be questioned, the fact that the three stimulators manufactured by defendants and Orthofix have different designs is not relevant to the court's decision. Relators have submitted judicially noticeable evidence that the stimulators use different technologies;

---

**115.** *Id.* at 9.

**116.** Relators' Supp. RJN at 7.

**117.** See *id.*

this fact alone is sufficient to support their allegation that determining one is safe and effective does not mean that all are safe and effective. For this reason as well, therefore, the court denies relators' request that it judicially notice these documents.

### 2. Defendants' Request for Judicial Notice

In their opposition, defendants request that the court take judicial notice of seven documents, all of which are available either on the CMS or FDA website, or on the website of CMMS' Durable Medical Equipment Medicare Administrative Contractor, NHIC Corp.: (1) The NCD for Osteogenic Stimulation (NCD 150.2);[118] (2) Form CMS 847;[119] (3) LCD L11501;[120] (4) LCD L11490;[121] (5) LCD L5012;[122] (6) LCD L27026;[123] and (7) the FDA's July 3, 1997 warning letter to Orthofix.[124] In their supplemental request for judicial notice, defendants ask that the court judicially notice ten additional documents, all of which are available on either the CMS or FDA website: from the CMS website, (1) the entire Medicare National Coverage Determinations Manual; (2) CMS' Coverage Decision Memorandum for Reconsideration of Electrostimulation (Electrical Stimulation) for the Treatment of Chronic Wounds; (3) LCD L32220; (4) LCD L30312; (5) LCD L35084; (6) LCD L33500; (7) LCD L32038; and from the FDA website: (8) "Overview of Medical Device Regulation, Classify Your Medical Device"; (9) "Medi-

cal Devices, Premarket Approval"; and (10) Premarket Notification (510k).[125] Because all of these documents are available on the websites of government agencies or a government contractor, they are appropriate subjects of judicial notice. Because the court finds the documents relevant to decision of the motion, it agrees with defendants that judicial notice is proper and it therefore grants their request.

## II. DISCUSSION

### A. Legal Standard Governing Motions to Dismiss

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory," or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995).

The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations.[126] See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553–56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a

**118.** *Id.,* Exh. 1 (NCD 150.2).

**119.** *Id.,* Exh. 2 (Form CMS 847).

**120.** *Id.,* Exh. 3 (LCD L11501).

**121.** *Id.,* Exh. 4 (LCD L11490).

**122.** *Id.,* Exh. 5 (LCD L5012).

**123.** *Id.,* Exh. 6 (LCD L27026).

**124.** *Id.,* Exh. 7 (July 3, 1997 FDA Warning Letter to Orthofix).

**125.** See Defendants' Supp. RJN at 1–3.

**126.** For this reason, although the complaint contains many allegations concerning the applicable law, the court does not accept them as true.

complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). Thus, a plaintiff's complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); see also *Twombly,* 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

## B. Relators' Federal FCA Claim

Because relators' FCA claim provides the only basis for subject matter jurisdiction, the court addresses it first.

### 1. Legal Standard Governing Federal FCA Claims

The FCA, 31 U.S.C. §§ 3729 *et seq.,* provides for "the recovery of civil penalties from those who knowingly present a false or fraudulent claim to the federal government for payment, or knowingly use a false record to avoid or decrease an obligation to pay the federal government." *Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1467 n. 1 (9th Cir.), cert. denied, 519 U.S. 865, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996). Originally enacted to punish and prevent massive frauds perpetrated by large contractors during the Civil War, the FCA's chief goal was to provide for restitution to the government of money taken from it by fraud. See *United States v. Bornstein,* 423 U.S. 303, 309, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976). The Supreme Court has refused to adopt a restrictive reading of the statute, however, holding that the FCA is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); *United States v. McLeod,* 721 F.2d 282, 284–85 (9th Cir. 1983).

The FCA authorizes individuals, known as "relators," to file civil suits, known as "qui tam actions," against persons who present false claims to the government.[127] 31 U.S.C. § 3730. It makes

---

**127.** An FCA action can be commenced in one of two ways. The government can file a civil action against the alleged false claimant. 31 U.S.C. § 3730(a). Alternatively, a private person, a relator, can commence a qui tam civil action against the alleged false claimant "for the person and for the United States Government ... in the name of the Government." 31 U.S.C. § 3730(b)(1). When a private person files a false claims action, the government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and material evidence and information supporting the complaint. 31 U.S.C. § 3730(b)(2). If the government declines to assume responsibility for the action, the relator has the right to conduct the action in the government's name. 31 U.S.C. § 3730(b)(4)(B). If the government elects to prosecute the action, the relator will receive 15 to 25 percent of any recovery, depending on the extent to which he substan-

liable any person who has (1) knowingly presented or caused to be presented a false or fraudulent claim; (2) knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid; or (3) conspired to defraud the government by getting a false or fraudulent claim paid. 31 U.S.C. § 3729(a)(1)-(3). The FCA defines "knowing" as having actual knowledge of information, or acting in either deliberate ignorance or reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b). Congress amended the FCA to include this definition to make " 'firm ... its intention that the act not punish honest mistakes or incorrect claims submitted through mere negligence.' " *United States ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir.1998) (quoting S.Rep. No. 99–345 at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272); see also *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir.1991) ("[T]he statutory definition of 'knowingly' requires at least 'deliberate ignorance' or 'reckless disregard' "). Thus, "[t]he phrase 'known to be false' ... means [known to be] 'a lie.' " *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir.1992); see *United States ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815–16 (9th Cir.1995). "The FCA does not define false. Rather, courts decide whether a claim is false or fraudulent by determining whether a defendant's representations are accurate in light of applicable law." *United States v. Bourseau*, 531 F.3d 1159, 1170–71 (9th Cir.2008).

■■■ "A civil action for False Claims Act liability requires four essential elements: '(1) a false statement or fraudulent

course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due.' " *United States ex rel. Ruhe v. Masimo Corp.*, 977 F.Supp.2d 981, 991 (C.D.Cal.2013) (citing *United States ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1174 (9th Cir.2006)); see also *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 997 (9th Cir.2010) (same). A plaintiff "must show an actual false claim for payment being made to the Government"; "[e]vidence of an actual false claim is the *sine qua non* of a False Claims Act violation." *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir.2002); see also *Cafasso, United States ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1055 (9th Cir.2011) (" 'It seems to be a fairly obvious notion that False Claims Act suit ought to require a false claim.' '[T]he [FCA] attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment," ' " citing *Aflatooni*, 314 F.3d at 997, and *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir.1995) (internal alterations original)); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996) ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.... [Thus there is no FCA liability] where regulatory compliance was not a *sine qua non* of receipt of state funding").

■■■ Relators who assert that a defendant has made a false claim can allege that defendant has submitted a factually false claim, or that defendant has given a false

---

tially contributes to prosecution of the action. 31 U.S.C. § 3730(d)(1). If the government chooses not to intervene, the relator will receive 25 percent to 30 percent of any recovery. 31 U.S.C. § 3730(d)(2).

certification. The prototypical false claims action alleges a factually false claim, i.e., an explicit lie in a claim for payment, such as an overstatement of the amount due. See *Maa v. Ostroff,* No. 12–cv–00200–JCS, 2013 WL 1703377, *15 n. 3 (N.D.Cal. Apr. 19, 2013) ("The 'factually false' theory refers to the 'archetypal *qui tam* False Claims Action' in which 'a private company overcharges under a government contract, [and] the claim for payment itself is literally false or fraudulent,'" citing *Hendow,* 461 F.3d at 1170 (alteration original)). Relators relying on a false certification theory allege that defendant's claim is false because defendant certified to a government agency that it had complied with laws, rules, or regulations governing the reimbursement of claims or other provision of benefits when it had not. See *Hopper,* 91 F.3d at 1266 ("Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance [with those rules] which creates liability when certification is a prerequisite to obtaining a government benefit"). There are two types of false certification claims— expressly false certification and impliedly false certification.

"Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted. Implied false certification occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid,* 616 F.3d at 998.

■ To show that claims were false under a false certification theory, a complaint "must plead with particularity allegations that provide a reasonable basis to infer that (1) the defendant explicitly undertook to comply with a law, rule or regulations that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Id.*

■ Like other allegations of fraud in federal court, claims "brought under the FCA must fulfill the requirements of Rule 9(b)" of the Federal Rules of Civil Procedure. *United States ex rel. Lee v. Smith-Kline Beecham, Inc.,* 245 F.3d 1048, 1051 (9th Cir.2001); see also *Cafasso,* 637 F.3d at 1054 ("The heightened pleading standard of Rule 9(b) governs FCA claims"). Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.Proc. 9(b). Conclusory allegations are insufficient, and the facts constituting the fraud must be alleged with specificity. *Moore v. Kayport Package Exp., Inc.,* 885 F.2d 531, 540 (9th Cir.1989). "A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer to the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Id.* at 540 (citation omitted). See also *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir.1997) (to satisfy Rule 9(b), "the complaint [must] identif[y] the circumstances of the alleged fraud so that defendants can prepare an adequate answer" (internal quotations omitted)); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) ("Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how"); *Walling v. Beverly Enters.,* 476 F.2d 393, 397 (9th Cir.1973) (concluding that allegations stating the time, place, and nature of allegedly fraudulent

activities met Rule 9(b)'s particularity requirement).

■ Thus, to satisfy Rule 9(b), a plaintiff must specify the content of the fraudulent representation, the person who made it, when and where the representation was made, and the manner in which it was untrue and misleading, or the circumstances indicating that it was false. See *In re GlenFed Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc). See also *Vess v. Ciba–Geigy Corp.*, 317 F.3d 1097, 1107 (9th Cir.2003) (plaintiff "alleges that the APA misrepresented its connection to Novartis, but he does not identify any specific misrepresentations or specify when and where they occurred. These allegations are not particular enough to satisfy Rule 9(b)").

■ "The knowledge or scienter element of a fraud claim need not be pleaded with particularity, but may be [ ] alleged generally pursuant to Rule 9(b). However, knowledge must still be pleaded sufficiently to make entitlement to relief plausible." *Owens v. Bank of America, N.A.*, No. 11–cv–4580–YGR, 2013 WL 1820769, *4 (N.D.Cal. Apr. 30, 2013); see also *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir.2007) ("While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind—or scienter—of the defendants may be alleged more generally"); *In re GlenFed Inc. Securities Litigation*, 42 F.3d at 1547 ("We conclude that plaintiffs may aver scienter generally, just as the rule states—that is, simply by saying that scienter existed").

## 2. Whether Relators Have Adequately Alleged the Submission of False Claims to Medicare

The parties' primary point of disagreement is whether claims submitted to Medi-

care for reimbursement of stimulators that had been approved by the FDA for lumbar use, but that defendants knew had been prescribed by physicians for cervical use, can under any circumstances and regardless of the nature of defendants' certifications or disclosures to Medicare, constitute false claims. Defendants argue that claims seeking reimbursement for cervical use of their stimulators can never be "false claims" under the FCA because Medicare specifically authorizes reimbursement of all stimulators for all uses, regardless of the use for which the FDA approved them.[128] For this reason, they argue, they had no duty to disclose to Medicare that the stimulators have been prescribed for off-label use, and the claims they purportedly submitted for reimbursement cannot have been false claims even though they allegedly failed affirmatively to disclose the use for which the devices were prescribed, and even though defendants allegedly certified that they were in compliance with Medicare rules and regulations.

Relators disagree. They argue that when prescribed for cervical use, defendants' stimulators are categorically excluded from Medicare coverage. As a result, they contend, defendants' submission of claims that did not disclose the stimulators would be used on the cervical spine, and that certified compliance with Medicare rules and regulations, were false. To show that off-label use of stimulators is not covered by Medicare, relators advance two alternative arguments. First, they contend that properly understood, the provision in the Medicare Manual that limits reimbursement, *inter alia*,[129] to devices that have been approved by the FDA through the PMA process means that

---

**128.** Motion at 8.

**129.** At the hearing, relators argued that if a device is being used for an off-label purpose,

Medicare covers only on-label use of devices—i.e., uses approved by the FDA in a PMA, PMA Supplement, or other type of clearance [130] allowing them to be marketed or used in clinical trials.[131] Because cervical use of defendants' stimulators is an off-

and the manufacturer has not applied for a PMA supplement, use of the device is considered experimental and is not reimbursable by Medicare. They appeared to assert that because defendants had not filed a PMA supplement for cervical use of their stimulators, that use was experimental and excluded from Medicare coverage. Based on this argument, the court ordered supplemental briefing concerning when Medicare considers a device experimental. In their supplemental briefing, relators contend it is "arguable" that defendants' devices are experimental when used for the cervical spine. (Relators' Supp. Brief at 12.) They note that Medicare regulations define nonreimbursable, experimental devices (Category A devices) as "device[s] for which 'absolute risk' of the device type has not been established (that is, initial questions of safety and effectiveness have not been resolved) and the FDA is unsure whether the device type can be safe and effective." 42 C.F.R. § 405.201(b). The regulations define reimbursable, nonexperimental/investigational devices (Category B devices) as "device[s] for which the incremental risk is the primary risk in question (that is, initial questions of safety and effectiveness of that device type have been resolved), or it is known that the device type can be safe and effective because, for example, other manufacturers have obtained FDA premarket approval or clearance for that device type." *Id.* Relators contend that because defendants' stimulators use technology that is different than that used in Orthofix's cervical stimulator, the fact that Orthofix's stimulator has obtained PMA approval does not demonstrate that another "manufacturer ha[s] obtained FDA premarket approval" for the device type. It is on this basis that they contend the cervical use of defendants' stimulators "arguably" falls within Category A as opposed to Category B, with the result that it is not reimbursable. (Relators' Supp. Brief at 11–12.) The court cannot agree. As defendants argue, devices are only categorized as Category A or B when they are part of a clinical study for which a manufacturer has obtained an IDE. (Defendants' Supp. Brief at 10.) See also 42 C.F.R. § 405.201(a)(2) ("CMS may consider for Medicare coverage certain devices with an FDA-approved investigational device exemption (IDE) that have

been categorized as non-experimental/investigational (Category B)"). Relators do not contend that defendants are engaged in a clinical study designed to gather information about the stimulators' safety and effectiveness. As the FDA itself acknowledges, when a physician prescribes a device for an off-label use, i.e., "when the intent is the 'practice of medicine,'" the manufacturer is not "require[d] to submi[t] [ ] an ... IDE[.]" (See "Off–Label" and Investigational Use of Marketed Drugs, Biologics, and Medical Devices—Information Sheet, http://www.fda.gov/regulatory information/guidances/ucm126486.htm (accessed August 11, 2014).) When, by contrast, "the principal intent of the investigational use of a test article is to develop information about the product's safety or efficacy, submission of an ... IDE may be required." (*Id.*) Because relators have not alleged that defendants are engaged in clinical studies to develop information about their stimulators' safety and effectiveness when used on the cervical spine, they have not shown that defendants' stimulators must be categorized as either Category A or B.

Relators also argue that even if cervical use of defendants' devices is not experimental, it is excluded from coverage under 42 C.F.R. § 411.15(*o*). (*Id.* at 12–13.) Once again, the court cannot agree. Section 411.15(*o*) provides that only Category B, not Category A devices, are reimbursable and only if they have been furnished in accordance with FDA-approved protocol. (See 42 C.F.R. § 411.15(*o*) ("The following services are excluded from coverage: ... Experimental or investigational devices, except for certain devices[ ] (1) Categorized by the FDA as a non-experimental/investigational (Category B) device ... and (2) Furnished in accordance with the FDA-approved protocols governing clinical trials").) Relators' reading of this section is erroneous because if a device is not part of a clinical study, the section does not apply and has no effect on coverage.

130. The FDA approves PMAs and PMA supplements. It clears devices that go through the 510(k) process.

131. Relators' Supp. Brief at 9.

**1390**

label use, and because defendants allegedly have not filed a PMA supplement or otherwise received FDA approval or certification of their stimulators for cervical use, relators assert that reimbursement is not available when the devices are prescribed for that purpose.[132]

Relators' second argument—which appears to assume that the Medicare Manual's limitation of coverage to PMA-approved devices does *not* preclude coverage for off-label use of defendants' stimulators[133]—is that NCD 150.2 is only the first step in the coverage determination. They contend NCD 150.2 must be read in conjunction with NCD 280.1, which prohibits coverage for off-label use of a stimulator.[134] This is so, they argue, because NCD 280.1 explicitly applies to all DME, and requires a case-by-case determination of coverage for devices like stimulators that are not explicitly identified in NCD 280.1 as covered or uncovered. In making this case-by-case determination, NCD 280.1 instructs carriers to consider "[w]hether the item has been approved for marketing by the Food and Drug Administration (FDA) and is otherwise generally considered to be safe and effective for the purpose intended." Relators assert that because the FDA has not approved the

marketing of defendants' stimulators for cervical use, and because the FDA has therefore not determined that the device is safe and effective for that purpose, NCD 280.1 . mandates· that a carrier conclude that cervical use of defendants' stimulators is not covered by Medicare.[135] Because this is so, relators contend, claims for reimbursement that do not disclose that stimulators have been prescribed for cervical use or that certify that a provider has submitted the claim in compliance with all Medicare rules and regulations are false.[136]

Based on their view that off-label use of defendants' stimulators is not reimbursable, relators allege that defendants have submitted false claims for reimbursement of stimulators they knew were prescribed for off-label use both because such claims are factually false and because they constitute a false certification that defendants have complied with all Medicare rules and regulations. They assert the claims are factually false because they listed the PMA·· approval number for the stimulators on CMS Form 1500 but did not explicitly disclose in the narrative portion of CMS 847 that the stimulators were intended for cervical use. In combination, relators assert, the inclusion of the PMA approval number and the non-disclosure of cervical

---

**132.** Opposition at 14, 17. In their supplemental brief, relators argue that "it is not, nor has it ever been, the position of the Relators that all 'off-label' uses of drugs or medical devices are categorically excluded from Medicare coverage." (Relators' Supp. Brief at 1.) This statement conflicts with relators' arguments in their opposition that "[a]bsent the [r]equired FDA [a]pproval, [c]ervical [u]se of [d]efendants' [d]evices [d]oes [n]ot [f]it [w]ithin [a]ny [r]eimbursable [c]ategory" (Opposition at 14), and that defendants' devices "when employed for [an] off-label use ... still could not be covered [by CMS] because they fail to meet the safety and effectiveness requirements protected 'through the Pre–Market Approval (PMA) process'" (Opposition at 17).

**133.** If relators correctly interpret the Medical Manual's restriction of coverage to PMA-approved devices as excluding coverage for off-label uses of defendants' stimulators, the NCDs would not apply to determine coverage and would be irrelevant.

**134.** Opposition at 15–16.

**135.** This conclusion, of course, depends on interpreting "device approved for marketing by the FDA" in NCD 280.1 the way that relators suggest it should be interpreted as it appears in the Medicare Manual.

**136.** *Id.* at 15, 21.

use constitute an affirmative misrepresentation that the stimulators were prescribed for on-label use.[137]

Relators also contend that defendants gave impliedly false certifications by certifying to Medicare every three years that they were in compliance with all applicable statutes and regulations. Specifically, they assert, defendants certified that they provide DME that meets the FDA's medical device effectiveness and safety standards under 42 C.F.R. § 424.57(c)(24), and that they honestly and accurately report all information necessary for Medicare to determine whether the devices for which they seek reimbursement are covered by Medicare under 42 C.F.R. § 424.57(b)(5).[138] Relators maintain that defendants' submission of claims for stimulators they knew had been prescribed for off-label use without disclosing that use on their CMS 847 forms was an impliedly false certification because it violated both of these regulations. First, they argue, by providing the devices for off-label use, defendants violated FDA regulations. Second, by including the PMA approval number while failing affirmatively to state that the devices would be used on the cervical spine, defendants failed to provide all the information Medicare required to make a coverage determination.

### a. Whether Defendants' Stimulators Are Categorically Excluded from Coverage When Prescribed for Cervical Use

In their reply, defendants assert that relators' argument that defendants' devices are never covered by Medicare when prescribed for cervical use is an incorrect interpretation of the Medicare Manual's restriction of coverage to devices approved by the FDA.[139] They contend that the term "device approved by the FDA" means a device that has been approved for any use, not necessarily the use for which it has been prescribed.[140] They argue that their stimulators satisfy this requirement because they have been approved by the FDA through the PMA process for lumbar use and have been given a PMA number. Consequently, defendants argue, their stimulators qualify for Medicare coverage if they are not otherwise excluded as unreasonable or unnecessary. For this reason, they maintain, their reimbursement claims are not false even if they do not affirmatively reveal the use for which the stimulators have been prescribed and even if they certify that they are in compliance with Medicare rules and regulations.[141]

The parties thus fundamentally disagree as to whether the Medicare Act and the requirements set forth in the Medicare Manual give CMS authority to cover off-

---

137. See Opposition at 22 n. 21 ("For an assertion to be 'false,' it need not be an affirmative misrepresentation; an omission of a material fact will suffice," citing *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 532 (10th Cir.2000)).

138. Opposition at 25 (citing 42 C.F.R. § 424.57(b)(5) & (c)(24)). Under 42 C.F.R. § 424.57(c)(24), a DME supplier must "meet [DME] quality standards." DME quality standards are set by HHS and include "provid[ing] only [DME] and other items that meet applicable [FDA] regulations and medical device effectiveness and safety standards." (Relators' RJN, Exh. N at 195 (Durable Medi-

cal Equipment, Prosthetics, Orthotics, and Supplies Quality Standards).) Under 42 C.F.R. § 424.57(b)(5), to be eligible for Medicare reimbursement, a DME supplier must "furnish[ ] to [the contractor] all information or documentation required to process the claim."

139. Relators' RJN, Exh. J at 136 (Medicare Benefit Policy Manual, Chapter 14—Medical Devices).

140. *Id.*

141. Reply at 5.

label uses of devices. Relators contend that CMS' discretion is restricted to covering the specific uses of a device the FDA has found to be safe and effective, either by issuing a PMA, a PMA Supplement, or some other approval—such as an approval of an IDE application—allowing the device to be marketed [142] by exercising its discretion to reimburse all or only some on-label uses. Defendants counter that CMS' discretion is broader, and that, so long as the FDA has approved a device for one use, CMS has discretion to reimburse all or only some on-label *and* off-label uses of the device.

The court agrees with defendants. The Medicare Manual states that "devices" approved through the PMA process are eligible for coverage, not that "the use of a device" that has been approved by the FDA is eligible for coverage. "Medicare reimbursement[ ] for off-label uses of medical devices [is] not addressed within the Medicare Act itself." *United States ex rel. Bennett v. Medtronic, Inc.,* 747 F.Supp.2d 745, 752 (S.D.Tex.2010). Courts have recognized, however, that Medicare does not impose an absolute ban on coverage for off-label use of drugs and devices. See, e.g., *id.* at 754 ("While Medicare and Medicaid typically do not reimburse off-label prescriptions for drugs, the relators have not pointed to a similar categorical restriction on reimbursement for Category B medical devices. For medical devices, eligibility for reimbursement depends on whether the procedure performed is "medically necessary' or 'reasonable and necessary' "); *United States ex rel. Nowak v. Medtronic, Inc.,* 806 F.Supp.2d 310, 345, 347 (D.Mass.2011) ("Medicare and Medicaid reimbursement for off-label uses of medical devices is more permissive than reimbursement for off-label uses of pharmaceuticals." ... Off-label promotion

cases involving medical devices are uniquely complicated by the relatively more permissive and undefined nature of Medicare and Medicaid cover of 'off-label' medical devices"); *Strom ex rel. United States v. Scios, Inc.,* 676 F.Supp.2d 884, 886 (N.D.Cal.2009) ("Medicare does indeed cover off-label uses of drugs in some contexts").

 CMS' December 17, 2003 coverage decision memorandum regarding its reconsideration of coverage of the use of electrostimulation devices for the treatment of chronic wounds supports the court's conclusion that the "device approved by the FDA" language in the Medicare Manual means that if a Class III device has been approved for any use by the FDA, CMS can conclude that a particular use is reimbursable even if that use is off label. In the memorandum, CMS stated:

> "The FDA [ ] considers the use of [electrostimulation] devices for the treatment (healing) of wounds to be significantly different than the use of these devices for the indications currently covered under a 510(k) clearance. When used to treat wounds, these devices are considered by the FDA to be Class III devices, which requires the manufacturer to go through the Premarket Approval (PMA) process. Therefore, manufacturers would have to submit valid scientific evidence to show that their products provide reasonable assurance of safety and effectiveness for the treatment of wounds before the FDA would approve a PMA application. As of this time, the law prohibits manufacturers from marketing the use of electromagnetic devices for wound healing. Lack of approval for this particular indication, however, does not preclude physicians and other health care providers from

**142.** Relators' Supp. Brief at 9–10.

providing this therapy for an unapproved use. In addition, lack of FDA approval or clearance for a specific non-labeled indication, when there are other labeled indications, is not an automatic disqualification for Medicare coverage. In addition, CMS assesses relevant health outcomes, above and beyond the safety and effectiveness regulatory mandate of the FDA. Although a device must receive FDA approval or clearance for at least one indication to be eligible for Medicare coverage ..., FDA approval/clearance alone does not entitle that device to coverage.... CMS has the authority to conduct a separate assessment of a device's appropriateness for Medicare coverage, including whether it is reasonable and necessary specifically for its intended use for Medicare beneficiaries" [143]

This passage makes clear CMS' practice and understanding that if the FDA has approved a device for at least one purpose, an off-label use can be reimbursed by Medicare. Cf. Medicare Benefit Policy Manual, § 50.4.2 ("An unlabeled use of a drug is a use that is not included as an indication on the drug's label as approved by the FDA. FDA approved drugs used for indications other than what is indicated on the official label may be covered under Medicare if the carrier determines the use

to be medically accepted, taking into consideration the major drug compendia, authoritative medical literature and/or accepted standards of medical practice. In the case of drugs used in an anti-cancer chemotherapeutic regimen, unlabeled uses are covered for a medically accepted indication as defined in § 50.5"). It therefore supports the court's conclusion that CMS' use of the phrase "device approved by the FDA" in the Medicare Manual does not mean "the use of a device that has been approved by the FDA," and that there is therefore no categorical ban on coverage of Class III devices for off-label uses.[144]

The explicit terms of certain of the NCDs and LCDs also support this conclusion. Some NCDs and LCDs, for example, specifically limit the use of class III devices to the uses for which they obtained FDA approval. See NCD 20.9, § B.1–B.3 (stating that ventricular assist devices ("VADs") "used for support of blood circulation post-cardiotomy are covered only if they have received approval from the [FDA] for that purpose, and are used according to the FDA-approved labeling instructions.... VADs used for bridge-to-transplant are covered only if they have received approval from the FDA for that purpose, and the VADs are used according to the FDA-approved labeling instructions.... VADs used for destination thera-

---

143. Defendants' Supp. RJN, Exh. 2 at 358–359 (at 6–7).

144. Relators appeared to contend at the hearing, and argue in their supplemental brief, that because Class III devices pose the greatest risk to health, CMS treats them differently in determining Medicare coverage. (See Relators' Supp. Brief at 2 (arguing that because stimulators are Class III devices, "the FDA approval process provides the only realistic means of [ ] assur[ing] [the device is safe and effective]").) The court cannot agree. Relators have cited no statutory, regulatory, or administrative guidance that makes such a distinction. Whatever merit relators'· conten-

tion has regarding the safety and effectiveness of defendants' devices when used for an off-label purpose, it goes either to relators' implied false certification claim (i.e., that defendants were required to submit a PMA supplement and obtain PMA approval before distributing their stimulators for off-label use, and falsely certified compliance with the FDA by failing to do so), discussed *infra*, or it is a policy argument that CMS should never cover off-label uses of Class III devices, including defendants' stimulators. To the extent relators advance a policy argument, it must be addressed to CMS; the court cannot impose such a condition on CMS.

py are covered only if they have received approval from the FDA for that purpose");[145] NCD 50.3 § B.1 (stating that cochlear implants for treatment of certain types of hearing loss are only covered if "used in accordance with [FDA]-approved labeling");[146] LCD L30312 (providing coverage for an ablative device only if it is "FDA-approved for the indications used");[147] see also NCD 20.32, § B (stating that the Transcatheter Aortic Valve Replacement ("TAVR"), a Class II device, is covered when used "for the treatment of sympomatic aortic valve stenosis when furnished according to a [FDA]-approved indication" and only if, *inter alia*, "[t]he procedure is furnished with a complete aortic valve and implantation system that has received FDA premarket approval (PMA) for that system's FDA approved indication").[148]

Some LCDs specify that both on-label use and off-label use of devices is covered when supported by peer-reviewed literature. See, e.g., LCD L35084 (covering non-coronary vascular stents "only when an FDA-approved stent is" either (1) "[u]sed for the FDA-approved indications" or (2) for certain other enumerated indications "supported by the peer medical literature");[149] LCD L33500 (stating that the contractor would "continue to limit payment for Vertebral Augmentation to those diagnostic indications which are either part of the FDA labeling or which are supported by appropriate peer-reviewed literature").[150] Finally, other LCDs specifically exclude coverage for off-label uses. See

LCD L32220 (excluding coverage for "any off-label uses" of FDA-cleared transcranial magnetic stimulation devices);[151] LCD L32028 (stating that the contractor "considers repetitive transcranial magnetic stimulation (rTMS) not medically necessary regardless if used for its FDA-approved indication or for any off-label uses").[152]

As defendants argue in their supplemental brief, none of these distinctions would be necessary if coverage of off-label uses of devices were categorically prohibited.[153] These examples further support the conclusion that the Medicare Manual's use of the term "devices approved by the FDA" does not mean a "use of a device approved by the FDA." For these reasons, relators misinterpret the section of the Medicare Manual on which they rely, and their claim, to the extent based on that interpretation, is not viable. See *Nowak*, 806 F.Supp.2d at 347–48 ("[T]o the extent that Nowak's claim alleges that the claims for off-label use are 'categorically' false because the device is unapproved for that use (and thus 'misbranded' or 'adulterated' or 'investigational'), she fails adequately to state a claim for relief in accordance with Rule 12(b)(6)").

Relators argue in their supplemental brief that the court in *Svidler v. U.S. Department of Health and Human Services*, No. C 03–3593 MJJ, 2004 WL 2005781, *5 (N.D.Cal. Sept. 8, 2004), rejected the conclusion the court reaches here—that once the FDA approves a de-

---

145. Defendants' Supp. RJN, Exh. 1 at 39 (Medicare National Coverage Determinations Manual ("Medicare Manual")).

146. *Id.* at 83.

147. *Id.*, Exh. 4 at 388 (LCD L30312).

148. *Id.*, Exh. 1 at 65 (Medicare Manual).

149. *Id.*, Exh. 5 at 403 (LCD L32641).

150. *Id.*, Exh. 6 at 417 (LCD L33500).

151. *Id.*, Exh. 3 at 378 (LCD L32220).

152. *Id.*, Exh. 7 at 430 (LCD L32038).

153. Defendants' Supp. Brief at 5.

vice for one use, the device is eligible for Medicare coverage for off-label uses as well.[154] *Svidler* is not controlling precedent, however. Even if it were, moreover, the court's conclusion here is not contrary to that in *Svidler* because *Svidler* does not stand for the proposition for which relators cite it. In *Svidler,* the plaintiff, a physician, argued that "because she [was] allowed to prescribe [a device for] off label uses, Medicare [*was required to* ] pay for off label uses." *Id.* The court found "[t]his leap of logic … unwarranted" because "Medicare excludes payments for all treatment not necessary, but does not require payment for all necessary treatments." *Id.* In other words, *Svidler* rejected the argument that because a physician can prescribe an off-label treatment without violating the FDCA, Medicare was required to pay for it and had no discretion to determine that it would not cover the treatment. This is not defendants' argument. They contend that because a physician can prescribe a device for off-label treatment without violating the FDCA— i.e., because the FDA has determined that a device is sufficiently safe and effective to be marketed for at least one use—Medicare has the discretion to pay for it when used for either an on-label or off-label purpose.

At bottom, relators' argument that defendants' devices can never reimbursed when prescribed for cervical use conflates the requirements of the Medicare Act and the requirements of the FDCA. Relators argue "devices approved by the FDA" can only mean devices used for the purposes for which the FDA approved them because those are the only uses that have been determined to be safe and effective through the PMA process.[155] Accepting relators' allegation that the FDA has not approved defendants' stimulators for cervical use as true, it is clear that if defendants wish to market or label the stimulators for that use, they must file a PMA supplement. As noted, however, coverage of devices under the Medicare Act serves a different purpose than regulation of those devices by the FDA, such that "off-label use of a medical device is not the same as a medically unnecessary use of that … device." *Bennett,* 747 F.Supp.2d at 751; see also *Ruhe,* 977 F.Supp.2d at 993 (same). As the Medicare regulations and the Medicare Manual do not bar reimbursement of devices supplied for off-label use, the fact that defendants have allegedly not filed a PMA supplement or obtained PMA approval for cervical use of their stimulators does not bar them from obtaining reimbursement for the devices if HHS has otherwise determined that they are "reasonable and necessary." See *Nowak,* 806 F.Supp.2d at 348 ("Nowak relies almost entirely upon the flawed rationale that because the biliary stents are unapproved for use in the biliary tree, they are 'categorically' or 'statutorily' nonreimbursable under the various federal health care programs").

b. **Whether in Addition to NCD 150.2, NCD 280.1 Must Be Consulted in Determining Coverage for Defendants' Stimulators and Whether It Bars Reimbursement for Cervical Use**

Relators' alternate argument is that NCD 150.2 must be read in conjunction with NCD 280.1 and that, so read, the NCDs proscribe coverage for off-label use of defendants' stimulators because one of the relevant considerations under NCD 280.1 is whether the FDA has approved marketing of the device for that particular use. Defendants contend that

---

**154.** Relators' Supp. Brief at 6.

**155.** Opposition at 17.

NCD 280.1 is not an adjunct or supplement to NCD 150.2, but merely guidance to which a contractor can turn if unaware of NCD 150.2.[156] They assert that under the plain language of NCD 150.2, stimulators are covered regardless of the use for which they are prescribed.[157] Because their stimulators are covered whether prescribed for lumbar or cervical use, defendants maintain, they had no duty affirmatively to disclose the intended use on reimbursement claim forms and did not make a false claim by failing to do so or certifying compliance with Medicare rules and regulations.

Again, the court agrees with defendants. As relators note, NCDs identify items or services for which Medicare coverage will be provided on a national basis. They outline the conditions under which a device or service will be covered (or not covered) and are binding on all contractors.[158] See 42 C.F.R. § 405.1060(a); *Almy,* 679 F.3d at 299; *Erringer v. Thompson,* 189 F.Supp.2d 984, 987 (D.Ariz.2001) ("An NCD is binding on all carrier[ ]s, fiscal intermediaries, and ALJs"); see also *Fratellone v. Sebelius,* No. 08 Civ. 3100(RMB)(RLE), 2009 WL 2971751, *5 (S.D.N.Y. Sept. 16, 2009) ("NCDs are binding on fiscal intermediaries, carriers, Q1Cs, ALJs, and the MAC"). They reflect CMS's determination regarding the reasonableness and necessity of a particular device or service—including that device's or service's safety and effectiveness.[159]

**156.** *Id.* at 6.

**157.** *Id.* at 5–7.

**158.** Relators' RJN, Exh. H (Medicare Program Integrity Manual).

**159.** At the hearing and again in their supplemental brief, relators argued that NCD 150.2 does not address the safety and effectiveness of a device, but only discusses patient circumstances. (See Relators' Supp. Brief at 2 ("NCD 150.2 does no more than describe the specific medical indications for which CMS considers these devices to be *medically* necessary, [and] does not speak to safety or effectiveness requirements at all").) At the hearing, relators argued that to determine the safety and effectiveness of the device, one has to turn to the FDA, which has authority to decide whether something is safe and effective. The court cannot agree. The FDA has authority to determine whether a device is sufficiently safe and effective to be marketed. CMS has authority to decide whether a device or a particular use of a device is sufficiently safe and effective to be considered reasonable and necessary and therefore reimbursable by Medicare. As the court has noted and as relators concede in their supplemental brief, in determining whether a device is sufficiently safe and effective to be considered reasonable and necessary, CMS considers, *inter alia,* whether it has been approved by the FDA. CMS, however, can consider other facts as well, such as whether the device has " 'been proven safe and effective based on authoritative evidence' or is [ ] 'generally accepted in the medical community as safe and effective for the condition for which it is used.' " *International Rehabilitative Sciences,* 688 F.3d at 997 (citing 42 U.S.C. § 1395y(a)(1)(A) and 54 Fedd. Reg. 4302, 4303–04 (Jan. 30, 1989); 60 Fed.Reg. 48417, 48418 (Sept. 19, 1995)). (See Relators' Supp. Brief at 1 (noting these methods of determining whether a device is safe and effective and acknowledging that the latter method is "contemplated by the Medicare regulations where a drug or device has not been FDA-approved for the particular use in question").) In their supplemental brief, relators assert that only NCD 280.1 and not NCD 150.2 considers the safety and effectiveness of defendants' stimulators. As noted, however, each NCD reflects CMS' determination—on a nationwide basis—that a particular device or service or particular use of a device is sufficiently safe and effective to be considered reasonable and necessary, and therefore reimbursable. NCD 150.2 is CMS' determination that stimulators that have been approved by the FDA are reimbursable when used "as an adjunct to spinal fusion surgery." In making this coverage decision, CMS presumably took into account whether stimulators that have been approved by the FDA for at least one use are sufficiently safe and effective; it likely did so by concluding that they are generally accepted in the medical commu-

NCD 150.2 covers stimulators. It states that "[t]he noninvasive stimulator device is covered only for the following indications: ... as an adjunct to spinal fusion surgery."[160] The LCDs for stimulators provide identical coverage. Nothing in the NCD or LCDs limits coverage for stimulators to those supplied for on-label use, nor otherwise differentiates between stimulators used on different areas of the spine. Consistent with this reading of NCD 150.2 and the LCDs covering stimulators, CMS 847 does not ask where on the spine the device is to be used or for what use the FDA has approved the device.[161] Also consistent with this, the HCPCS code for stimulators—E0748—is the same whether the device is used on the lumbar or cervical spine. Further supporting the conclusion that NCD 150.2's broad language covering all noninvasive stimulators used as an adjunct to spinal fusion surgery means what it says (and covers even those stimulators that have been approved only for use on a part of the spine other than that for which they have been prescribed) is the fact that, as cited above, numerous NCDs and LCDs explicitly limit reimbursable use of a device to on-label uses, see NCD 290.9, § B.1–B.3; NCD 50.3, § B.1; NCD 20.32, § B; LCD L30312, provide coverage for both on-label and off-label uses under certain specified conditions, see LCD L35084; LCD L33500, or explicitly exclude coverage for off-label uses, see

LCD L32220; LCD L32028. As defendants argue,[162] these NCDs and LCDs show that CMS understands how to limit coverage of devices to on-label uses when it determines that doing so is reasonable and necessary. The fact that other NCDs make explicit distinctions between on-label and off-label uses supports the conclusion that where, as here, an NCD make no such distinction, it covers both on- and off-label uses of the device in question.[163]

NCD 280.1 does not add additional, mandatory requirements to the coverage provided by NCD 150.2. Rather, it is a non-comprehensive, summary resource designed to assist contractors in determining whether a specific DME is covered. By its own terms, NCD 280.1 serves merely "as a quick reference tool" to "facilitate the contractor's processing of DME claims."[164] See *In the Case of Cashflow Solutions, Inc.*, Docket No. M–11–1340, 2012 WL 4470589, *3 (Medicare Appeals Council Aug. 14, 2012) ("NCD 280.1 is a DME reference list"). NCD 280.1 provides a list of some devices that are covered and some that are not, but the list is not exhaustive. *In the Case of B.A.*, Docket No. M–11–1734, 2011 WL 7145268, *2 (Medicare Appeals Council Sept. 23, 2011) ("The list of covered DME equipment and non-covered equipment in NCD Manual section 280.1 is not intended to be a com-

---

nity as safe and effective for cervical use, and thus concluded that they are reimbursable under the Medicare Act, when used as an adjunct to spinal fusion surgery.

**160.** Defendants' RJN, Exh. 1 (NCD 150.2).

**161.** See *id.*, Exh. 2 (Certificate of Medical Necessity Form 847).

**162.** Defendants' Supp. Brief at 5.

**163.** Relators argue that the court should not so conclude because CMS could not predeter-

mine the safety and effectiveness of every undisclosed, off-label use of a device. (Relators' Supp. Brief at 9.) Whatever merit this argument has, the court again believes it is more properly addressed to CMS than to the court. If relators believe it unsafe to cover all uses of stimulators—both on- and off-label— they should urge CMS to modify NCD 150.2 to provide coverage only for on-label uses of stimulators. The court cannot interpret NCD 150.2 in a manner that is inconsistent with its plain language.

**164.** Relators' RJN, Exh. F (NCD 280.1).

plete list but to provide guidance on the types of items which are and are not covered by Medicare"). It also provides a list of the criteria contractors should consider when deciding on a case-by-case basis whether provision of a device for which HHS has not made a coverage determination on a nationwide basis should be reimbursed.

The list of covered devices in NCD 280.1 directs the contractor to the specific NCD governing coverage for that device. The contractor must then determine coverage by applying the provisions of that NCD. NCD 280.1 does not instruct the contractor also to apply the coverage criteria set forth therein. See *Cashflow Solutions,* 2012 WL 4470589 at *3 ("NCD 280.1 is a DME reference list and, as relevant here, it includes 'Lymphedema Pumps' among its list of items. NCD 280.1 provides that lymphedema pumps are 'covered,' and refers specifically to NCD 280.6. NCD 280.1 does not otherwise contain any language specific to the coverage of (or non-coverage of) pneumatic compression devices or lymphedema pumps. The appellant would have the Council ignore specific instructions within NCD 280.1 to refer to NCD 280.6, which addresses, more specifically,

the coverage parameters for pneumatic compression devices. NCD 280.6 is binding legal authority and it must be applied to decide the coverage question herein"). Indeed, such a requirement would be redundant, as HHS already considered those criteria in deciding that the device should be covered and issuing a specific NCD.[165]

The NCD covering a device is binding on the contractor even if it is not listed in NCD 280.1's non-exhaustive list of covered devices. A contractor deciding coverage for a device that NCD 280.1 states is covered does not apply the coverage criteria set forth in that NCD in addition to the criteria contained in the device's NCD. So too, a contractor deciding coverage for a device that is the subject of an NCD but is not listed as covered in NCD 280.1 does not apply the coverage criteria set forth in the latter. Because NCD 280.1 is intended merely as a reference point and not a mandatory supplement to other NCDs, relators' contention that it applies and precludes coverage for cervical use of defendants' stimulators is unavailing. Instead, whether defendants' stimulators are covered is fully answered by NCD 150.2, which does not limit coverage only to on-label use.[166]

**165.** For this reason, the court finds unpersuasive relators' argument that the two NCDs must be construed together. (See Relators' Supp. Brief at 2–3.) Relators' argument ignores the express language of NCD 280.1, which states that it serves merely as a reference tool for contractors. It also ignores NCD 280.1's instruction that where an NCD covers a device, the contractor is to refer to that NCD rather than NCD 280.1 in determining coverage. Relators' argument further ignores the HHS decisions the court cited above that specifically construe NCD 280.1 in this manner. Relators, moreover, provide no citation—not even to the terms of NCD 280.1 itself—that supports their argument that although coverage of defendants' stimulators on a nationwide basis is explicitly addressed in NCD 150.2, NCD 280.1 provides additional,

mandatory limitations that a contractor must apply on a case-by-case basis to determine coverage.

**166.** Relators argue that considering NCD 150.2 in isolation would lead to "absurd results." (Opposition at 8 n. 4.) Doing so, they argue, would lead to the conclusion that "any device with 'opposing pads, wired to an external power supply,' capable of creating an electromagnetic field 'between the pads at the fracture site,' would fall within the definition of [covered] ... stimulator[s], and would, therefore, be a reimbursable item, even if the device in question had been assembled using a gas grill igniter in the inventor's garage." (*Id.*) Relators' argument lacks merit, however, because only stimulators that fall within one of the four eligible categories of medical devices under the Medicare Manual (including

### c. Whether Defendants Have an Affirmative Obligation to Apply for a PMA Supplement

Relators also argued—most clearly at the hearing and in their supplemental brief—that defendants have an affirmative obligation to apply for a PMA supplement because they knowingly derive substantial profit from the distribution of stimulators for cervical use and because their representatives tell patients how to modify the stimulators for cervical use. As noted, this forms the basis for relators' contention that defendants made impliedly false certifications to Medicare when they allegedly submitted requests for reimbursement of stimulators distributed for off-label use, certifying that they were in compliance with all applicable regulations.[167] The court agrees with relators that if defendants had an affirmative duty to file a PMA supplement, requesting reimbursement for an off-label use of one of their stimulators could be considered an impliedly false certification of compliance with all applicable regulations and subject defendants to liability under the FCA.

Relators argue that the FDA's PMA approval of defendants' stimulators required them to comply with 21 C.F.R. § 814.39.[168] That section provides:

"After FDA's approval of a PMA, an applicant shall submit a PMA supplement for review and approval by FDA before making a change affecting the safety or effectiveness of the device for which the applicant has an approved PMA[.] ... [C]hanges for which an applicant shall submit a PMA supplement include, but are not limited to, the following types of changes if they affect the safety and effectiveness of the device: (1) New indications for use of the device." 21 C.F.R. § 814.39.

The FDA has stated that it interprets the phrase "new indication for use of the device" to mean "a change to the intended patient population, disease state, or to other clinical aspects of the device use, such as duration of use, *anatomical site*, or surgical procedure."[169] It gives as an example of a change to an anatomical site that constitutes a new indication for use of a device requiring a PMA supplement the following:

"[The] FDA approved a PMA for a prosthetic heart valve for use in the aortic position. The PMA applicant modified the indication to include the mitral position. No changes were made to the device itself. In the mitral position, the valve is subjected to different physiological conditions, such as valve closing pressures and flow rates, from the aortic position. These conditions can affect the performance of the valve by affecting the hemodynamics[.] ... The physiological and potential performance differences between the two positions may significantly impact clinical

---

devices that have been approved by the FDA under the PMA approval process) are reimbursable. If a device assembled using a gas grill igniter was not approved by the FDA, it would not be eligible for reimbursement. One would never have to address whether the device was reimbursable under NCD 150.2 because CMS could not even consider it for reimbursement.

167. SAC, ¶ 54; Relators' Supp. Brief at 15.

168. Relators' Supp. Brief at 13 & n. 23. This allegation is not included in the complaint,

although the court has taken judicial notice of the PMA approval orders for defendants' stimulators, which do require such compliance. (See Relators' Supp. RJN, Exhs. G at 109 (FDA Approval Materials for SpinaLogic), J at 182 (FDA Approval Materials for Spinal-Pak).)

169. Relators' Supp. RJN, Exh. B at 43 (FDA Guidance for Industry and FDA Staff at 7–8 (emphasis added)).

outcome. Therefore, new clinical data were needed to ensure that the heart valve remained safe and effective when implanted in the new location. Additional preclinical testing was not needed because the test data provided in the original PMA to support the valve for use in the aortic position were sufficient to support the valve for use in the mitral position. Therefore, FDA determined that the submission of a [type of PMA] supplement was appropriate for this change." [170]

Relators argue that defendants' stimulators and the Orthofix stimulators employ different technologies.[171] The Orthofix stimulator uses pulsed electromagnetic field technology, the SpinaLogic employs combined magnetic field technology, and the SpinalPak utilizes capacitive coupling technology.[172] For that reason, they assert, the devices cannot be "lumped together into one group for purposes of safety and effectiveness assessments." [173] They maintain the different technologies require "testing tailored to the specific safety and effectiveness issues implicated by" the use of that device on different parts of the spine, and thus a change to the anatomical site on which they operate constitutes a new indication for use.[174]

■ Defendants do not disagree that the of their stimulators on the cervical spine constitutes a new indication for use of the devices.[175] Rather, they argue that a manufacturer only has a duty to seek a PMA supplement if it intends to market, promote, or label a device for a new use; merely distributing the device with knowledge that a physician has prescribed or will prescribe it for off-label use, they contend, does not give rise to an affirmative duty to seek PMA approval.[176]

In support of their argument that defendants have an affirmative duty to file a PMA supplement, relators cite 21 C.F.R. § 801.4.[177] This regulation appears to provide some support for their position. It states:

"The words intended uses or words of similar import in §§ 801.5, 801.119, and 801.122 refer to the objective intent of the persons legally responsible for the labeling of devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by

**170.** *Id.* at 46.

**171.** Relators' Supp. Brief at 7. These allegations are not in the complaint. Nonetheless, the court considers them because it has taken judicial notice of the PMA approval materials for each of defendants' devices found on the FDA website.

**172.** *Id.* at 7 n. 17; Relators' Supp. RJN, Exhs. G at 115 (FDA Approval Materials for SpinaLogic), J at 186 (FDA Approval Materials for SpinalPak), and L at 224, 230, and 241 (FDA Approval Materials for Cervical–Stim).

**173.** Relators' Supp. Brief at 7.

**174.** *Id.*

**175.** Indeed, as relators discuss, defendants previously argued in their opposition to the petition to reclassify stimulators that the FDA has "noted that the different [stimulator] modalities and intended uses require[] tailored testing. Furthermore, [the] FDA has emphasized that seemingly minor alterations to [stimulator] devices (e.g., to their waveforms or designs) may adversely impact their safety and effectiveness." (See Opposition at 11 (citing Relators' RJN, Exh. A at 13 (BGS Reclassification Opposition Group Comments)).)

**176.** Reply at 10–11; Defendants' Supp. Brief at 12–13.

**177.** Relators' Supp. Brief at 15.

such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the devices, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put." 21 C.F.R. § 801.4.

The last sentence of § 801.4 appears to place an affirmative duty on a manufacturer that knows a device will be used for an off-label purpose to label the device accordingly. A manufacturer, however, cannot label a device for an off-label purpose without first obtaining a PMA supplement. Thus, the terms of § 801.4 would appear to indicate that defendants have an affirmative duty to file a PMA supplement if they intend to distribute their devices knowing that a physician has prescribed them for an off-label use. See *Ramirez v. Medtronic, Inc.*, 961 F.Supp.2d 977, 991 n. 9 (D.Ariz.2013) ("According to th[is] regulation, [ ], mere awareness of off-label use can potentially result in the creation of a new intended use").

It does not appear, however, that courts in the Ninth Circuit and elsewhere construe § 801.4—whose purpose is to define

the terms used in §§ 801.5 and 801.119—as imposing an affirmative duty on manufacturers to file a PMA supplement under § 814.39 any time they know or should know that a patient intends to use, or that a physician has prescribed or will prescribe, a device for off-label purpose. In *Carson,* as noted, the Ninth Circuit unequivocally concluded that "a manufacturer is not liable [for distributing a misbranded product] merely because it sells a device with knowledge that the prescribing doctor intends an off-label use." 365 Fed. Appx. at 815. Moreover, in *Ramirez,* the court noted that the Ninth Circuit's discussion in a case regarding preemption under the FDCA—*Perez v. Nidek Co., Ltd.,* 711 F.3d 1109 (9th Cir.2013)—appeared to "foreclose efforts to claim that merely alleging knowledge of off-label use in the absence of off-label promotion by the manufacturer can establish a new, unregulated intended use by the manufacturer." 961 F.Supp.2d at 992 n. 9. In *Perez,* the Ninth Circuit concluded that a plaintiff's state law claims alleging that a defendant misled patients by failing to disclose that a laser was not approved by the FDA for certain types of surgeries was not preempted by the FDCA because to hold otherwise would impose a "disclosure requirement … 'different from, or in addition to' the requirements applicable to the Laser under the [FDCA]." 711 F.3d at 1118.

A Minnesota district court directly addressed the question in *Riley v. Cordis Corp.,* 625 F.Supp.2d 769 (D.Minn.2009), and concluded that § 801.4 did not impose an affirmative duty on a manufacturer to file a PMA supplement when it knew its product was being used for off-label purposes. First, it held, imposing such a duty would be inconsistent with the fact that the FDA allows manufacturers to provide health care providers with academic journals and certain other types of studies

discussing the benefits of using their device for off-label purposes without requiring them to file a PMA supplement. *Id.* at 781–82. Second, it noted that "[b]efore approving a change to a label . . . , the FDA would need to give the proposed change careful study," and that "[i]t seem[ed] unlikely that § 801.4 was intended to establish an open-ended requirement that the manufacturer of a Class III device go to the FDA to seek permission to alter its label every time the manufacturer becomes aware of a new off-label use of the device." *Id.*

The court believes it is bound by the explicit holding in *Carson* that a manufacturer cannot be held liable merely because it knows its device is being prescribed for an off-label purpose. Even if it were not bound by *Carson*, the court finds the reasoning of the *Riley* court persuasive. Something more than the mere knowledge that a device is being prescribed for off-label use is required before a manufacturer is obligated to file a PMA supplement. To hold otherwise would create an affirmative duty on the part of a manufacturer to apply for a PMA supplement every time it learned that a device was being prescribed or used for an off-label purpose; this would be impracticable. Moreover, the court agrees with *Riley* and with defendants that the fact that the FDA continues to state that manufacturers may provide health care providers with academic journals and other types of material discussing the benefits of using a device for off-label purposes without running afoul of the FDCA's ban on promotion[178] is inconsistent with the existence of a requirement that manufacturers distributing a device they know will be used for off-label purposes file a PMA supplement. Relators

emphasize their allegation that defendants derive a significant portion of their profits from stimulators they distribute knowing they have been prescribed for off-label use. They have cited no authority, however, for the proposition that the amount of profit a manufacturer derives from off-label uses is relevant in assessing whether it must file a PMA supplement. FDA regulation of devices is meant to ensure their safety and effectiveness. So long as a manufacturer does not promote its device for off-label use, it is not clear why knowledge that a specific percentage of its profit is being derived from off-label use should trigger a duty to file a PMA supplement. Indeed, it seems that once physicians begin to prescribe a device for off-label use on a widespread basis, the likelihood that the device is safe and effective for the purpose for which it is being prescribed increases.

As to whether the fact that defendants' employees demonstrate for patients how to use the stimulators for off-label purposes constitutes a form of promotion that imposes an affirmative obligation on defendants to file a PMA supplement, the court finds it inappropriate to consider the question in deciding this motion. Relators did not clearly plead such a theory in their second amended complaint, and none of their briefs other than the supplemental brief addressed it. Defendants, who filed their supplemental brief simultaneously, have not had an opportunity to respond to the point. See *El Pollo Loco, Inc. v. Hashim,* 316 F.3d 1032, 1040–41 (9th Cir. 2003) (indicating that the court may consider new issues raised in reply if it gives the opposition an opportunity to respond); *Provenz v. Miller,* 102 F.3d 1478, 1483 (9th Cir.1996) ("[W]here new evidence is pre-

---

**178.** Relators' RJN, Exh. E at 71 (Good Reprint Practice (noting that providing health care providers with academic journals discussing the benefits of the use of a manufac-

turer's device for off-label purposes, so long as they are peer reviewed and not accompanied by a manufacturer's comments, is not considered promotion)).

sented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond"). While the court declines to consider the matter, it will nonetheless afford relators leave to amend so they can plead the theory properly.[179]

■ Even had relators adequately alleged this theory of implied false certification based on the fact that defendants' employees have demonstrated off-label uses for patients, and even had the court found such a theory valid, the court would nonetheless dismiss the claim. This is because relators have failed to plead facts satisfying *Ebeid*. To plead an implied false certification claim adequately under *Ebeid*, relators must allege that "(1) the defendant explicitly undertook to comply with a law, rule or regulation that is implicated in submitting a claim for payment and that (2) claims were submitted (3) even though the defendant was not in compliance with that law, rule or regulation." *Ebeid*, 616 F.3d at 998. While the court finds *infra* that relators have adequately alleged defendants submitted claims to Medicare, they have not sufficiently alleged the first of the elements set forth in *Ebeid*: relators plead that every three years defendants signed a Medicare En-

rollment Application, pursuant to 42 C.F.R. § 424.57, which certified compliance with all applicable rules and regulations, and stated that defendants "underst[oo]d that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions."[180] Relators, however, have not alleged with particularity when these certifications took place. Their allegation that defendants made the certifications on unspecified dates in unspecified years does not satisfy the heightened pleading requirement of Rule 9(b). Relators' claim, to the extent based on an implied false certification theory, fails on this basis as well.[181]

### d. Conclusion Regarding Relators' Ability to State a False Claim Act Claim Based on Defendants' Submission of Claims to Medicare

Because relators incorrectly assert that Medicare covers defendants' stimulators only when prescribed for on-label use, their argument that defendants' failure affirmatively to disclose the fact that their stimulators were prescribed for off-label use makes their claims factually false and that they have provided a false certification that their devices were being prescribed for on-label use fails.[182] Relators'

---

179. The court expresses no opinion as to whether such a claim would be legally cognizable, and will await full briefing by the parties before doing so.

180. SAC, ¶¶ 5–6; Relators' RJN, Exh. O at 206 (Medicare Enrollment Application).

181. As the court has already found that Medicare covered defendants' stimulators for on- or off-label use, defendants' certification that they would provide Medicare with all information pertinent to a coverage determination was not false; this is because, given the breadth of Medicare's coverage, defendants were not required to alert Medicare that their stimulators had been prescribed for off-label use.

182. For the same reason, relators have also failed to allege adequately that defendants' failure to disclose that the stimulators were prescribed for off-label use was material. "To establish materiality ... the question is merely whether the false certification—or assertion, or statement—was relevant to the government's decision to confer a benefit." *Ebeid*, 616 F.3d at 997 (citing *Hendow*, 461 F.3d at 1173). The fact that Medicare does not limit its coverage of stimulators to those that will be used for on-label purposes indicates that the failure to disclose whether a stimulator was to be used on- or off-label was not relevant to the government's decision to reimburse defendants. This conclusion is reinforced by the fact that neither CMS Form

theory that defendants made an implied false certification because they had an affirmative obligation to seek a PMA supplement similarly fails. The court grants leave to amend this aspect of the false certification claim, however, as relators may be able to allege facts that if proved, would show that, through demonstrations of off-label uses by their employees, defendants promoted the stimulators for such uses and were thus obligated to file a PMA supplement. This may support a claim that defendants made an implied false certification of compliance with all applicable regulations when they submitted claims for reimbursement for stimulators prescribed for off-label use without first seeking a PMA supplement.

## 3. Whether Relators Have Adequately Alleged Submission of False Claims to Medicaid and other Federal Reimbursement Programs

The federal government reimburses a portion of the cost of DME under the Medicaid program, Federal Employees Health Benefit Program, Federal Worker's Compensation Programs, CHAMPVA, and Tricare. Relators contend that defendants submitted false claims to these programs as well.[183] Defendants argue that relators have not adequately alleged an FCA claim based on their submission of claims to these programs because the complaint contains no allegations indicating that the programs reimburse for defendants' devices any differently than Medicare.[184]

As noted, relators' FCA claim must satisfy the heightened pleading requirements of Rule 9(b). Relators must therefore "set forth what is false or misleading about a statement and why it is false." *Ebeid,* 616 F.3d at 998. Relators' complaint alleges only that state Medicaid requires that a device be medically necessary in order to obtain reimbursement, and that "[s]everal state Medicaid programs expressly exclude payment for DME that has not received PMA [approval] from the FDA for its intended use."[185] While pleading that "several states" have certain requirements may satisfy the more lenient Rule 8(a) pleading standard, it is not sufficiently detailed to satisfy the heightened Rule 9(b) requirements, and therefore fails adequately to set forth what is false or misleading about defendants' alleged submission of reimbursement claims to state Medicaid. Plaintiffs must plead, with specificity, what makes defendants' claims false; without pleading which states have the requirement mentioned in the complaint, and alleging with particularity what the individual requirements of each program are, plaintiffs have not adequately alleged that defendants made false statements when submitting claims for reimbursement under these state programs.

With respect to the other federal programs to which defendants purportedly

---

1500 nor CMS 847 includes a question regarding the use to which a stimulator will be put or the scope of PMA approval of the stimulator. See *United States ex rel. Hess v. Sanofi–Synthelabo, Inc.,* No. 4;05CV570MLM, 2006 WL 1064127, *7 (E.D.Mo. Apr. 21, 2006) ("According to Plaintiff's Complaint, ¶ 13, although 'the Medicare claim form has a line for indicating the patient's diagnosis,' it 'does not require a doctor to indicate what stage cancer the patient has.' As such, the stage of a patient's cancer is not material to a

doctor's seeking reimbursement for his or her prescribing Eloxatin for treatment of cancer. The stage of a patient's cancer, therefore, was not material to [the government] in making a decision to reimburse doctors for their prescription of Eloxatin").

**183.** *Id.,* ¶ 33.

**184.** Motion at 12 n. 8.

**185.** SAC, ¶ 32.

submitted false claims, the complaint alleges only that they "exclude DME that is not reasonable and necessary."[186] As previously discussed, a device can be approved by the FDA as safe and effective for one purpose and be considered reasonable and necessary—and thus reimbursable—although supplied for another. Accordingly, relators have failed to allege with particularity how it is that defendants submitted false claims for reimbursement to the other federal programs.[187]

### 4. Whether Relators Have Adequately Alleged Scienter

■■ The deficiencies the court has noted in relators' pleading of falsity also render inadequate their allegations of scienter. Although, as noted, scienter may be alleged generally in an FCA case, none of the facts relators plead support their conclusory allegation that defendants knowingly submitted false claims. Indeed, as the court has noted, none of the statutes, regulations, NCDs, LCDs, or claim forms indicate that defendants were required to disclose the fact that they were seeking reimbursement for devices prescribed for off-label use. Thus, none put defendants on notice that they needed to do so.

Relators, moreover, allege no other facts that could support an inference of such an awareness on defendants' part. While relators do plead facts supporting an inference that defendants knew they were supplying stimulators to patients for off-label use, none of their allegations supports an inference that they knew they could not lawfully seek reimbursement for the stimulators from Medicare or the other federal programs identified in the complaint. Indeed, the only allegation that is even relevant in assessing whether relators have adequately pled facts supporting an inference that defendants knew they were submitting false claims is their assertion that on May 20, 2013, Milko asked a former Biomet distributor how Biomet got Medicare to reimburse Biomet for its lumbar-only device when it was prescribed for cervical use. Relators allege that the former Biomet representative said that neither CMS 847 nor HCPCS code E0748 discloses the level of the spine to which the device was to be applied.[188] This statement does not support an inference that defendants—or at least Biomet—knew it was submitting false claims because nothing in it indicates that Biomet knew that because CMS 847 did not request this information, and HCPCS code E0748 did not reveal it, using that form and that code to request reimbursement for an off-label use was unlawful or constituted the making of a false claim.

Relators argue that the 1997 warning letter from the FDA to Orthofix put defendants on notice that any cervical use of their stimulators required a PMA supplement.[189] As mentioned, the warning letter notified Orthofix that it could not market a stimulator approved for non-spinal use as a device that could be used on the cervical

---

**186.** Relators also allege that under these programs, the federal government has "no obligation to pay a DME provider for a device marketed unlawfully." (*Id.*) As the court has noted multiple times, however, relators explicitly state that they do not assert that defendants unlawfully marketed their devices. (Opposition at 26–27.) Indeed, there are no allegations of unlawful marketing in the complaint.

**187.** Relators also fail to plead that defendants ever made certifications to these programs or what the content of such certifications was. As a result, to the extent their FCA claim concerning other federal programs is based on false certification, it fails for this reason as well.

**188.** SAC, ¶ 48.

**189.** *Id.,* ¶ 13; Opposition at 14–15.

spine without submitting a PMA supplement and obtaining PMA approval.[190] Here again, relators conflate the FDA approval process with Medicare reimbursement: even assuming this warning put defendants on notice that a lumbar-approved stimulator could not be marketed for use on the cervical spine without submission of a PMA supplement,[191] defendants correctly assert that the FDA's warning that a PMA supplement had to be filed to market the stimulator for cervical use did not put defendants on notice that Medicare would not cover cervical use of the stimulator under the Medicare Act.[192]

In the absence of any factual allegations supporting relators' argument that defendants acted with the requisite scienter, the lone allegation in the complaint that defendants "knew that they were falsely and/or fraudulently claiming reimbursement" is too conclusory to plead a plausible claim for relief under Rule 8(a), *Iqbal,* and *Twombly.*

### 5. Whether the Second Amended Complaint Has Adequately Alleged That Defendants Submitted Claims to the Government

As noted, claims "brought under the FCA must fulfill the requirements of Rule 9(b)." *Lee,* 245 F.3d at 1051; see also *Cafasso,* 637 F.3d at 1054 ("The heightened pleading standard of Rule 9(b) governs FCA claims"). Even if relators could allege that a claim to Medicare or another federal program for reimbursement of lumbar-approved stimulators prescribed

for cervical use was false absent disclosure of the off-label use, and even if they had adequately alleged that defendants had the requisite scienter, the court would nonetheless dismiss their FCA claim as to some of the federal programs. This is because relators have not alleged with particularity that defendants ever submitted false claims for reimbursement under these programs to the government.

#### a. Whether Relators Have Alleged Representative Examples of False Claims Submitted by Defendants

"[U]se of representative examples is [ ] one means of meeting the pleading obligation" a relator must satisfy in order adequately to allege defendants submitted false claims under Rule 9(b). *Ebeid,* 616 F.3d at 998. Relators have not sufficiently alleged any representative instances in which defendants submitted false claims to federal programs, however. Relators allege that on February 2, 2012, DJO submitted a claim to the Minnesota Health Care Programs for a stimulator prescribed for off-label use, and that Biomet and EBI submitted claims for stimulators prescribed for off-label use to that program on February 16, 2010, March 10, 2010, and March 18, 2011.[193] Allegations of claims submitted to a state program do not adequately plead the who, what, when, where, and why of claims submitted to a federal program. Moreover, relators do not allege that defendants' claims to the Minnesota program failed to disclose that the stimulator had been prescribed for off-

---

**190.** Defendants' RJN, Exh. 7 (1997 Warning Letter from the FDA to Orthofix).

**191.** Defendants appear to agree with this proposition. (Reply at 10 ("The letter *might* be relevant if Relators were arguing that Defendants had notice they could not advertise their devices as FDA approved for a use other than what they were actually FDA approved for").)

**192.** Motion at 13 ("[The] FDA's warning that a company could not market a product whose approval specifically excluded vertebra use as being FDA-approved for spine fusions provide[d] no notice to Defendants that *Medicare* [would] not cover use of their spinal devices for spinal uses" (emphasis added)).

**193.** *Id.,* ¶¶ 45, 50.

label use. According, these allegations do not plead that defendants submitted a false claim to Medicare or any other federal program.

Relators have not otherwise alleged any facts concerning representative claims submitted by Biomet and EBI that were false. While they do allege more facts concerning DJO, those facts also fail adequately to allege representative examples of false claims. The second amended complaint identifies three physician orders DJO received in 2011 for which it purportedly submitted claims to Medicare for reimbursement.[194] The orders, however, are themselves not claims to Medicare. Rather, they are prescriptions received by DJO. Evidence of prescriptions do not plead the who, what, when, where, and why of any claims DJO submitted to Medicare.

■■■ The allegation that claims were submitted to Medicare, moreover, is made on information and belief. "Allegations of fraud based on information and belief do not satisfy FRCP 9(b) requirements.... unless accompanied by a statement of the specific facts on which the belief is founded." *County of Santa Clara v. Astra U.S., Inc.,* 428 F.Supp.2d 1029, 1036–37 (N.D.Cal.2006) (citing *Moore,* 885 F.2d at 540); see also *Shroyer v. New Cingular Wireless Services, Inc.,* 622 F.3d 1035, 1042 (9th Cir.2010) ("Claims made on information and belief are not usually sufficiently particular, unless they accompany a statement of facts on which the belief is founded"). Relators' allegation on information and belief that DJO submitted claims to Medicare based on these physician orders is not supported by the pleading of specific facts on which realtors' belief is founded. It is therefore inadequate to support their claim of fraud.

Even if relators' allegation that DJO submitted claims to Medicare based on these physician orders were adequate to support their fraud claim, moreover, it is too conclusory to satisfy Rule 9(b). It does not state who at DJO submitted the claims, when they did so, where the claims were sent, or provide any details concerning the claims or what made them false. For all of these reasons, relators have not adequately alleged any representative examples of either defendant's submission of false claims to Medicare or other federal programs.

**b. Whether Relators Have Adequately Alleged Particular Details of a Scheme to Submit False Claims Coupled with Reliable Indicia that Lead to a Strong Inference Claims were Actually Submitted**

■■ Relators can also meet their pleading burden by alleging "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid,* 616 F.3d at 999–1000 (citing *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 190 (5th Cir. 2009)). Assuming, without deciding, that relators have adequately alleged a scheme to submit false claims, they have not adequately pled reliable indicia leading to a strong inference that defendants actually submitted false claims to each of the federal programs. More specifically, they have adequately alleged reliable indicia that DJO submitted claims to Medicare and Medicaid, and that Biomet and EBI submitted claims to Medicare, but have not adequately alleged reliable indicia that DJO, Biomet, or EBI submitted claims to the remaining federal programs.

**i. DJO**

As respects DJO, relators have alleged many facts giving rise to a strong infer-

194. SAC, ¶ 45.

ence that DJO distributed its stimulator for off-label use. Specifically, they plead that Milko heard—albeit from unspecified sources—that DJO sales personnel instructed patients how to use the SpinaLogic on the cervical spine and that two patients he fitted for a stimulator told him they had been fitted with the SpinaLogic following prior cervical spinal surgeries. Relators allege that an Orthofix sales representative from Temecula worked at DJO for two weeks, and that an individual in "DJO upper management" told him 40 % of DJO's SpinaLogic business involved off-label cervical use. They allege that on June 21, August 30, and September 1, 2011, on behalf of Dr. John Anson, the Spine and Brain Institute in Las Vegas, Nevada, faxed SpinaLogic prescriptions to a DJO representative for three patients scheduled for cervical fusion surgery.[195] Finally, they allege that in March 2013, at the national convention of the American Academy of Orthopedic Surgeons in Chicago, DJO representatives told Milko that sales of the SpinaLogic for cervical use constituted at least 75 % of the company's business in some areas.

Relators have also pled facts indicating that DJO submitted claims for off-label use of its stimulator to Medicare and Medicaid. In April 2011, an Orthofix sales associate purportedly went to work for DJO; concurrently, Orthofix lost some of its physician referral sources, including doctors who regularly referred Medicare patients for cervical stimulators. In August 2012, the DJO Regional Sales Director and a DJO sales representative allegedly told Modglin that DJO routinely billed federal-ly-sponsored health care programs like Medicare and Medicaid for off-label distribution of SpinaLogic. Finally, DJO submitted a claim for a stimulator prescribed for use on the cervical spine to a Minnesota insurance reimbursement plan. These facts—most specifically, the fact that the DJO Regional Sales Director told Modglin DJO routinely billed Medicare and Medicaid for stimulators prescribed for off-label use—strongly support the inference that DJO submitted claims for such use to Medicare and Medicaid.

The only allegation supporting an inference that DJO submitted similar claims to any other federal program, however, is the director's purported statement that DJO routinely billed federally-sponsored health care programs for stimulators prescribed for off-label use. This single statement is not sufficient to support a strong inference that DJO submitted a claim or claims for off-label use of a stimulator to the Federal Employees Health Benefit Program, Federal Worker's Compensation Programs, CHAMPVA, or Tricare. It is far too general, and could just as easily be a reference to submission of claims to Medicare and Medicaid. Because relators do not adequately allege the actual submission of claims to these other federal programs, their FCA claim against DJO concerning those programs must be dismissed.

### ii. Biomet and EBI

As respects Biomet and EBI, relators also plead facts tending to show that these companies distributed their stimulator, SpinalPak, for cervical use. They plead, for example, that on September 5, 2012, a

---

**195.** Relators also plead facts that do not support the inference they seek to have drawn. They allege, for example, that Milko deposed two physicians in another lawsuit, both of whom are Medicare providers and perform cervical and lumbar surgery. These physicians purportedly testified that they had or-dered stimulators from DJO. This testimony does not support in any meaningful way an inference that the doctors ordered stimulators for cervical use from DJO, much less that DJO submitted reimbursement claims for the stimulators to Medicare.

Minnesota clinic confirmed to Dr. David Ketroser that it routinely prescribed SpinalPak for both cervical and lumbar fusions, and both Medicare and non-Medicare patients, and that it had done so for a particular patient Ketroser had referred.

Relators also plead facts tending to show that Biomet and EBI submitted claims to Medicare. They allege, for example, that Medicare patients told Milko they had used the SpinalPak on their cervical spine. They also allege that on February 16 and March 10, 2010, and on March 18, 2011, Biomet and EBI submitted claims to the Minnesota Health Care Programs for a stimulator prescribed for off-label use, which were reimbursed. Relators plead that on May 20, 2013, a former Biomet distributor told Milko that Biomet had received Medicare payment for off-label use of its stimulator because CMS 847 does not require disclosure of the level of the spine to which the device will be applied, and because the relevant HCPCS billing code covers both lumbar and cervical use. On May 29, 2013, a former Biomet sales representative allegedly told Modglin that she had sold Biomet's device to Medicare patients for off-label use, and on May 31, 2013, a former Biomet sales representative told Modglin he had sold the SpinalPak to Medicare and Medicaid patients in Texas between 2009 and 2011 for cervical use. These facts—most specifically, admissions by Biomet and EBI employees that they sold stimulators for off-label use to Medicare and Medicaid patients and that Medicare reimbursed the company for stimulators prescribed for off-label use because Medicare claim forms did not require that that fact be disclosed—support an inference that Biomet and EBI submitted claims to Medicare.

Because relators do not allege that either of the Biomet employees who stated they sold stimulators for off-label use to Medicare patients also said that Biomet billed Medicaid for the devices, and also do not allege that Biomet obtained reimbursement for such use from Medicaid, relators have not adequately alleged reliable indicia that support a strong inference claims were actually submitted to Medicaid. Additionally, there are no factual allegations that could support a strong inference that Biomet and EBI ever submitted claims to any of the other federal programs identified in the complaint. Consequently, relators' FCA claim must be dismissed to the extent based on an allegation that Biomet and EBI submitted claims to Medicaid, the Federal Employees Health Benefit Program, Federal Worker's Compensation Programs, CHAMPVA, and Tricare.

### 6. Whether the Court Will Grant Leave to Amend

Defendants ask that the court dismiss relators' claim with prejudice.[196] Relators request that the court allow them to amend the complaint so they can lay out their theories of liability under the FCA more clearly. The court concludes as a matter of law that the only potentially cognizable theory of liability under the FCA relators have alleged or argued with respect to Medicare is that defendants were required to file a PMA supplement because their employees had promoted the stimulators for cervical use by demonstrating how to modify them for such use. If this were determined to be promotion that necessitated the filing of a PMA, defendants may have made an impliedly false certification to Medicare by submitting claims for reimbursement stating that they were in compliance with all applicable regulations, as they have not filed for a PMA supplement. Because this theory was not adequately pled in the complaint, and because it has not been fully briefed by both

---

196. Motion at 2.

parties, the court will afford relators leave to amend to plead such a theory. It concludes, however, that allowing leave to amend their federal FCA claim on any other theory as respects claims to Medicare would be futile. Consequently, the scope of leave to amend granted is narrowed and limited to this one theory. See *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1051 (9th Cir.2008) ("Dismissal without leave to amend is proper if it is clear that the complaint could not be saved by amendment"); *California ex rel. California Department of Toxic Substances Control v. Neville Chemical Co.*, 358 F.3d 661, 673 (9th Cir.2004) ("[D]enial of leave to amend is appropriate if the amendment would be futile," citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

Because it appears possible relators could allege that defendants submitted false claims to Medicaid, the Federal Employees Health Benefit Program, the Federal Worker's Compensation Programs, CHAMPVA, and/or Tricare, the court grants relators leave to amend their federal FCA claim to the extent based on the submission of claims to these programs if they can cure the deficiencies noted in this order.

### C. Whether the Court Should Exercise Supplemental Jurisdiction Over Relators' State Law Claims

Relators' federal FCA claim provides the sole basis for federal subject matter jurisdiction in this case. Because it is presently unclear whether relators can state a viable federal claim, the court declines to exercise jurisdiction over relators' state law claims at this time. See *Wade v. Regional Credit Association*, 87 F.3d 1098, 1101 (9th Cir.1996) ("Where a district court dismisses a federal claim, leaving only state claims for resolution, it should

decline jurisdiction over the state claims and dismiss them without prejudice"); *Harrell v. 20th Century Insurance Co.*, 934 F.2d 203, 205 (9th Cir.1991) ("[I]t is generally preferable for a district court to remand remaining pendent claims to state court"); *Anderson v. Countrywide Financial*, No. 2:08–cv–01220–GEB–GGH, 2009 WL 3368444, *6 (E.D.Cal. Oct. 16, 2009) ("Since state courts have the primary responsibility to develop and apply state law, and the *Gibbs* values do not favor continued exercise of supplemental jurisdiction over Plaintiff's state claims, Plaintiff's state claims are dismissed under 28 U.S.C. § 1367(c)(3)"); 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [state-law] claim [if] ... the district court has dismissed all claims over which it has original jurisdiction"). See also *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law").

### III. CONCLUSION

For the reasons stated, the court grants defendants' motion to dismiss the second amended complaint. Relators' federal FCA claim is dismissed with prejudice to the extent it is based on defendants' submission of claims to Medicare; the only exception is a claim alleging that defendants made impliedly false certifications to Medicare that they were in compliance with all applicable regulations when they had an affirmative duty to file a PMA supplement because their employees were promoting use of the stimulators for the cervical spine. This aspect of the claim is dismissed with leave to amend. Relators' federal FCA claim is dismissed without

prejudice to the extent it is based on defendants' submission of claims to Medicaid, the Federal Employees Health Benefit Program, the Federal Worker's Compensation Programs, CHAMPVA, and Tricare. Relators may file a second amended complaint addressing the deficiencies noted herein within twenty (20) days of the date of this order.